## THE MARIA MARTIN.

1. Even flagrant fault committed by one of two vessels approaching each other from opposite directions does not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent a collision.
2. Damages equally divided in a case of collision on an application of this rule.

APPEAL from the Circuit Court for the District of Wisconsin.

On the night of the 22d of June, 1866, the steam propeller Cleveland, in rounding Bar Point,* at the head of Lake Erie, on her way up the lake to Detroit, made the lights of a tug and tow, descending the Detroit River near its mouth into the lake, at the supposed distance of two miles. They proved to be the lights of the tug McClellan, having in tow the bark Maria Martin, bound down the lake.

At the time when the lights were made by the lookout of the propeller, this last named vessel had just obtained her offing from Bar Point and was put upon her course for Bois Blanc light,† north by east. Her course had been west by north around Bar Point until she brought Bois Blanc light to bear northeast by east, when she at once steered for it. The tug, with the bark in tow, was at this time steering south-southwest. The respective courses were, therefore, one point divergent. The propeller made the red signal-light of the tug and the red signal-light of the bark from a quarter to half a point over her starboard bow. The McClellan made the green light of the propeller one-fourth of a point over her port bow. The night was a bright starlight night, with a light wind from southwest. The propeller was running past the land from six to six and a half miles an hour. The tug and tow were at about the same speed. All three of the vessels had their red and green signal-lights properly displayed, and they were easily distinguishable. At this time another tug, the Muir, with five vessels in tow, was

---

\* On the Canada shore; see diagram at p. 34.

† On the American side; see diagram, p. 34.

slowly ascending the Detroit River a little in advance of the propeller, and at about the same distance from the eastern or Canada shore. The bark was towed by means of a rope paid out from her starboard bow, four feet from the bowsprit, 360 feet, and made fast to a samson post in the deck of the tug, about midships, and some twenty-five feet from the taffrail, over which it of course played, from starboard to larboard, as the tow might sheer on the one hand or the other. As the vessels approached each other, their respective lights closed in until they were running nearly " stem on." At this juncture, and when separated by about half a mile, the tug and bark being pretty well on to the American shore, and the steamer having a fair berth on the Canada side, the tug sounded one sharp whistle, and in thirty seconds repeated the whistle as a signal to the propeller that she wished her to pass on her port side. The propeller responded with one blast of the whistle, and ported her helm and displayed to the tug her red signal-light. The tug ported her own helm when she turned half a point and became steady on her course. The propeller ran past the tug, port side to port side, with, however, only a narrow berth between ships, when at the instant in which her stem had passed the stern of the tug, the bark collided with the propeller on her port side; the port bow of the bark striking the port bow of the steamer, and the steamer sinking in ten minutes after the blow. The point of collision was about a mile and a half below Bois Blanc light; a point at which tugs usually prepare to cast off their tows, and the tows get ready to enter the lake, and in this case apparently when abreast the light, the bark had commenced making sail preparatory to hauling in her line and steering her course down the lake.

In consequence of the catastrophe the owners of the propeller libelled the bark in the District Court for Wisconsin. It was not asserted that the tug had been guilty of any fault; the main matter relied on in support of the libel being that the bark had not followed the tug, but had made a sudden sheer. Whether she had made such a sheer or not was a

principal point of fact in the case, and one about which much conflicting evidence was given. Numerous persons who had been on her swore that she followed straight after the tug, but not less numerous ones who had been on the propeller swore that at the instant when *her* stern had passed the stern of the tug the bark shut in her red light and showed her green light to the propeller; a fact which, if true, would show that she had left her line of direction and shot off at nearly right angles with the course of the tug.* It seemed to be in proof that the bark, though a well-steering vessel, had not steered well after the tug through the night; and the allegation of the steamer was that the bark having begun to make sail preparatory to steering down the lake, had misunderstood the whistle sounded by the tug, a theory which the evidence of the mate supported. But whether she had made any *such* sheer as would have made this accident unavoidable, if the steamer had not been first guilty of the greatest faults, was another question; and whether, if she had made such a sheer, the steamer had not been the cause of her doing so, was yet a third one.

The reader thus sees that the case involved two points:

*First.* One of mere fact, dependent on conflicting testimony, which it would not be at all worth while to report, whether there was a sheer but for which the catastrophe would not have occurred.

*Second.* A point of law, whether, if so, it was in view of the propeller's previous conduct, a fault.

The District Court, taking one view of the evidence, considered, apparently, that the alleged sheer was nothing more than the bark's keeping on her course before she had time to swing round and follow the tug, a matter which that court considered would, to those on the steamer, look just like a sheer.

That court held, therefore, that the propeller was alone to blame, and it dismissed the libel.†

---

* The theory of the libellants is illustrated in their diagram on p. 34.

† The view of the District Court, which was that pressed by the respondents, is illustrated by their diagram on p. 35.

Diagram illustrating the libellant's general view.

Diagram illustrating the respondent's general view.

Barque

1st position.

Tug

N

Barque

2d position.

Place of collision according to the respondent's view, and the barque having kept on her course.

Tug

Propeller

Propeller

On appeal to the Circuit Court, while that court was fully
of the opinion with the District Court, that the propeller was
in great fault in driving at a reckless rate in narrow water,
where vessels in tow usually cut off from their tugs, and
where a small channel is liable to be crowded by numerous
tows—as this channel at this time actually was crowded—yet
making a somewhat different case on the evidence from that
which the District Court had assumed, it inculpated the bark
also.    On the first point—the liability of the steamer—it
said thus:

"It is clear that the libellants knew that the Detroit River, on
account of the magnitude of its commerce, and the number of
tugs with loaded vessels passing through it, had to be navigated
with great watchfulness and care, and that the tug and bark
whose lights they had made, as they were descending the river,
could not be handled, in case of peril, as well as the propeller
could.    Notwithstanding these things, we find these officers
managing their boat without regard to the dangers of navigat-
ing this river, and exercising no more watchfulness than if they
had been navigating the open lake.    Although they saw the
lights of the tug and bark, and pronounced them to be very
bright, at the distance of two miles, yet they did not change the
course of their boat until the tug had signalled them to do it,
and at this time the vessels had approached within half a mile
of each other.    But even then, by the practice of reasonable sea-
manship, all trouble could have been avoided.    If the propeller,
instead of porting half a point, or three-fourths even, had gone
a point further to the eastward, the collision could not have
taken place.    There was nothing in the way of her doing this,
for the river was wide enough, and there were no lights closing
on them from the east.    To put only one hundred feet between
her and the tug, when she could, with safety to herself, put a
greater distance between them, considering the circumstances
of this navigation, was bad seamanship.    Watchful and careful
officers, having due regard to the rights of persons and property,
would not have taken the risk that the officers of the propeller
did.    They surely risked enough by not changing the course of
their boat until she was close on to the tug.    Common vigilance
required that when they changed the course of the propeller

they should have made a more decided change. But those officers, besides not going further to the eastward, were in fault in not checking the speed of their boat. They should not have entered a narrow river where in the night there is always more or less danger of collision, without materially slackening the speed at which they had been running. And this was only the more incumbent on them, because, at so short a distance from the tug and bark, they should, as careful seamen, have apprehended the possibility of danger "

On the second point—the liability of the bark after examining the evidence—the Circuit Court said thus:

"It is plain, notwithstanding the faults of the propeller, that this disaster would not have occurred had the bark followed, as she was required to do, the course of the tug. That she did not follow after the tug, but when the propeller was abreast of the tug, sheered to the port of the tug, shutting out from the propeller her red light, and showing only her green light, and continued on in this course until she struck the propeller on her port side, as she was swinging to starboard, is a fact clearly established by the weight of the evidence. . . . I agree that it is not easy to reconcile the sheering of the bark, with the testimony of those on board of her, but we are more concerned to know that the sheering *did* occur, than to show *how* it occurred. . . . The conduct of the bark was the result of either mistaken orders or careless management. We have the testimony of the mate that an important signal was mistaken, and it is not at all unlikely that the error in management commenced with this mistake. It is in proof, that the bark through the night did not steer after the tug, and as she was a good steering vessel, the inference is plain, that there was a want of proper observation on the part of those who had her in charge. The approach of the propeller was not regarded by her, because the officers of the deck understood the signal of the tug for casting off line, instead of an approaching vessel. If a vessel is in tow, she is not therefore excused from keeping close watch, and observing and obeying all signals. The duty of watchfulness was the greater, because the river was full of boats, and light as the night was, there was more necessity for it, than if it had been daylight, but this duty does not seem to have been appreciated by the officers of the bark. When the bark made the sudden

sheer to port, the propeller not being required to anticipate it, did all she could under the circumstances, put her wheel hard a port.

"*It follows from what has been said,* that a decree should be entered, dividing the loss."

The case was now here on appeal by the *owners of the bark.* The owners of the steamer did not appeal, being content to pay half the loss; and they seeking simply an affirmance of the decree of the Circuit Court.

*Mr. George B. Hibbard, for the appellant:*

I. Collated the evidence with skill, to show

1. That in point of fact there was no sheer, but that the tug's running off to starboard upon a line divergent half a point, while the bark sagged down the stream, caused the same appearance which the vessels would have presented had the tug kept her course and the bark sheered, and that this most natural ocular deception caused such of the witnesses as swore innocently that the bark sheered, to make that mistake; and that this running to starboard of the tug, and sagging down stream of the heavily laden bark, with her deep draught of water, unable as she was to obey her port helm as quickly as did the tug, caused the collision to happen in the precise manner in which it did.

2. That it was a physical impossibility that the bark could have *so* sheered as to have caused the exact sort of collision, which confessedly had taken place, and the particular form of wound which was found to have been left. This position was elaborately and ably argued on the evidence, with the aid of diagrams.

II. Passing to the point of law, Mr. Hibbard argued that it was difficult to reconcile the two parts of the opinion in the Circuit Court. Upon the facts set forth and arguments made in the first part, the conclusions reached in the second did not properly "follow." The reverse of them were the true consequences. Upon perusal of the latter part of the opinion, the conclusion, it was argued, could not be avoided, that the court had lost sight of the substantial rule, that that

vessel, which, through fault, causes haste, alarm, and peril, shall not escape the consequences of such fault by imputing something to another vessel which has been caused by the haste, alarm, and peril thus brought about. The maritime, law, the learned counsel contended, would not tolerate inquiry in favor of a wrongdoer, as to even probable error committed by another. It would not countenance the weighing of possible culpabilities against the ascertained faults of a positive offender, much less the comparison of some shade of imaginable mistake with the transgressions of one absolutely and indefensibly in the wrong. The Circuit Court had assumed that if the bark did sheer division of damages must follow. This was fundamental error. To make any vessel wholly or partly responsible she must commit *a fault*. To commit a fault is to violate some rule, some duty. To sheer is not a fault, it is but an accident. For accident no man is responsible. The actual question in collision cases never is, "What was done?" It is, "Which committed fault?" It was a great mistake to say, as was said, in the Circuit Court, that "the court was more concerned to know that the sheering *did* occur than to show *how* it occurred." The very opposite of this proposition was the true one. *How* anything occurs in a collision case is of every consequence, for it is in the manner of the occurrence, its cause, that *fault* must exist or not exist. The ascertainment of the facts only aids in arriving at the conclusion, wherein, and what, and how many were the faults which produced the result. It is of but little if any aid to conclude, if this thing had been done or not done, no collision would have happened. In almost every collision, if anything different had been done, there would have been no collision. In the opinion delivered in the Circuit Court, it is assumed that if the bark sheered, it was something which the propeller was not bound to guard against. But was not the propeller bound to guard against the natural consequences of the haste, alarm, and peril she created? Nay, more, was she not bound so to navigate, so to obey plain rules, that haste, alarm, and peril should not arise?

That the propeller was guilty, many times guilty; that she violated statute and rule, is emphatically declared and enforced by the Circuit Court; that she brought about the haste, alarm, and peril, in the midst of which this collision took place, is not to be doubted. Can it be that under such circumstances the bark can be held even partly responsible for the result thus caused? Such a doctrine will inflict a blow upon commerce which commerce can scarcely sustain; for practical men will not risk property and incur the hazards of a hazardous business beneath rules of such impracticable severity.

*Messrs. Spalding and Dickman, contra,* argued in support of the decree below.

Mr. Justice CLIFFORD delivered the opinion of the court.

Appeals under the additional act " to amend the judicial system " are subject to the same rules, regulations, and restrictions as are prescribed in case of writs of error.[*] Both parties in a civil action may sue out a writ of error, to a final judgment, but where one party only exercises the right the other cannot assign error in the appellate court; and the same right to remove the cause from the subordinate to the appellate court for re-examination is secured to both parties by the act of Congress allowing appeals, instead of writs of error, in cases of equity or of admiralty and maritime jurisdiction, or of prize or no prize, as provided in the second section of the act allowing such appeals.[†] Subject to the same rules and regulations as in case of writs of error, both parties may appeal, in an equity, admiralty, or prize suit, from the final decree of the subordinate court, but the appeal, when entered in the appellate court, is also subject to the same restrictions as are prescribed in case of writs of error. Where each party appeals each may assign error, but where only one party appeals the other is bound by the decree in the court below, and he cannot assign error in the

---

[*] 2 Stat. at Large, 244.          [†] 1 Ib. 84; 2 Ib. 244.

appellate court, nor can he be heard if the proceedings in the appeal are correct, except in support of the decree from which the appeal of the other party is taken.* Apply that rule to the present case and it is clear that the appellees cannot be heard in opposition to the decree of the Circuit Court, as they did not appeal from that decree.

They were owners and freighters of the steam propeller Cleveland, and they filed the libel in the District Court in a cause of collision, civil and maritime, against the bark Maria Martin to recover damages for the loss of the steamer and her cargo on the twenty-second of June, 1867, occasioned by a collision between the bark and the steamer, near the mouth of the Detroit River, whereby the steamer, with all her cargo on board, consisting of sugar, and other merchandise of great value, was sunk in five fathoms of water and became a total loss.

Four days before the disaster the steamer started from Ogdensburg, in the State of New York, and she was bound on a voyage from that port to the port of Chicago, in the State of Illinois, laden as aforesaid, and having fifty persons on board as passengers. None of these facts are denied by the claimants, but the libellants also allege that the collision was occasioned without any fault on the part of the steamer, and by the negligence, inattention, and want of proper care and skill on the part of those in charge of the bark, which is expressly denied in the answer.

Heavily laden with a cargo of grain, the bark was proceeding down the river, and was bound on a voyage from Chicago to Buffalo, in the State of New York, both the colliding vessels being duly enrolled and licensed for the coasting trade on those waters. Propelled by her own motive power the steamer had complete and effective command of her own movements. On the other hand the principal motive power of the bark was the engine of the tug, with which she was connected by means of a hawser paid out

* The William Bagaley, 5 Wallace, 412; The Quickstep, 9 Ib. 665; The Alonzo, 2 Clifford, 550.

from the forward part of the vessel, three hundred feet or more in length, and made fast to the samson post of the tug, being what is called in such navigation a stern line, as the design was that the vessel without motive power should follow the tug which had her in tow, but the bark on this occasion had unfurled, or "pretty well made," her mainsail, and her mainstaysail, as she had nearly reached the place in the river where-vessels in tow usually cast off from the tug, and her master and other officers were in charge of her deck.

Prior to rounding Bar Point, on the Canada shore, the course of the steamer had been west by north, but shortly after passing that point she changed her course to north by east, and headed for Bois Blanc light, as alleged by the libellants. In coming round, or immediately after she was put upon her new course, she made the lights of the tug and tow descending the river towards the lake, heading south-southwest, at the distance, as supposed, of two miles, and not far from two o'clock in the morning.

Attempt is made in argument to show that the lookout of the steamer was incompetent, but the objection is without any legal importance, as the lights of the tug and tow were seasonably seen by all those in charge of the deck of the steamer. They first made the red signal light of the tug and of the tow half a point over their starboard bow, and the evidence shows that the tug having the bark in tow made the green signal light of the steamer one-fourth of a point over her port bow.

Mutual fault is charged, that is, each charges the other with fault, and it is quite evident that one or both must be guilty of the charge, as neither imputes any fault to the tug, and the evidence fully-satisfies the court that it was good weather, a bright starlight night, a moderate wind, and smooth water.

Where negligence or fault is shown to have been committed by either party the rule that the loss must rest where it fell, as in case of inevitable accident, can have no application, for if the fault was one committed by the claimant's vessel

alone, then the libellant is entitled to recover; or if by the libellant's vessel alone, then the libel must be dismissed; or if both vessels were in fault, then the settled rule of law is that the damages must be apportioned between the offending vessels.*

Doubtless the district judge applied the second rule, as he entered a decree dismissing the libel, but the Circuit Court came to the conclusion from the evidence that both of the colliding vessels were in fault, and reversed the decree of the District Court, and entered a decree that each should pay a moiety of the damages and their own costs, and from that decree the claimants of the bark appealed to this court, but the libellants did not appeal, and of course they cannot assign error nor can they be heard in opposition to the last-named decree. On the contrary the decree is conclusive as against the libellants, that the steamer was in fault, and the only question presented by the appeal of the claimants is whether the Circuit Court erred in determining that the bark also was in fault, for if she was, then the decree of the Circuit Court must be affirmed, but if she was not, then the decree of the Circuit Court must be reversed, and the cause remanded with directions to enter a decree affirming the decree of the District Court.

Vessels engaged in commerce are held liable for damage occasioned by collision on account of the complicity, direct or indirect, of their owners, or the negligence, want of care or skill on the part of those employed in their navigation. Owners appoint the master and employ the crew, and consequently are held responsible for their conduct in the management of the vessel.

Allusion was frequently made in the course of the argument to the fact that the bark was in charge of a tug, which renders it necessary to make one or two remarks upon that subject before proceeding to examine the real question presented for decision.

---

* The Morning Light, 2 Wallace, 557; Union Steamship Co. v. New York and Va. Steamship Co., 24 Howard, 313; The Catharine, 17 Ib. 170.

Whenever the tug is under the charge of her own master and crew, and in the usual and ordinary course of her employment undertakes to transport another vessel, which for the time being has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary, or usually employed, she is legally responsible for the navigation of both vessels. Cases arise, undoubtedly, where both the tug and the tow are jointly liable for the consequences of a collision, as when those in charge of the respective vessels jointly participate in their control and management, and the master and crew of each vessel are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Where the officers and crew of the tow, as well as the officers and crew of the tug, participate in the navigation of the vessels, and a collision with another vessel ensues, the tug alone, or the tow alone, or both jointly may be liable for the consequences according to the circumstances, as the one or the other or both jointly were either deficient in skill or were culpably inattentive or negligent in the performance of their duties.*   Much examination of that subject, however, is unnecessary in this case, as neither party imputes any fault to the tug, and it is clear from the evidence that the imputation, if made, could not be sustained, as it fully appears that she seasonably ported her helm and allowed the steamer to pass her in safety.

All three of the vessels, that is, the tug, the tow, and the steamer, had their signal lights properly displayed, and the respective lights were burning brightly and were easily distinguishable.  Suggestion is made that the lookout of the steamer was incompetent, but the suggestion is entitled to no weight, even if it be well founded in fact, as the proof is entirely satisfactory that the two colliding vessels were seen by each other in season to have taken every precaution to have avoided a collision.  They were approaching each other from nearly opposite directions, which clearly rendered it

* Sturgis *v.* Boyer, 24 Howard, 121 ; Sproul *v.* Hemmingway, 14 Pick. 5

proper, as between the tug and the steamer, that each should port their helms and pass to the right.    Seasonable attention to that rule would certainly have prevented a·collision if the tow had followed the movement of the tug, as she was bound to do, without unnecessary delay.

Although the bark was larger than the ,steamer, yet her headway was about the same as that of the steamer, as she was somewhat aided by the current in addition to the motive power of the tug.    Larger in size and of greater length than the steamer she probably would not obey her helm quite as quick as the tug or the steamer, but the evidence in the case fails to satisfy the court that the difference in that respect contributed in any degree to the collision.

Probably those in charge of the steamer hesitated for a time as to which side of the tug they would pass, as they proceeded on their course, heading nearly stem on, until the tug and steamer approached within half a mile or less of each other, when the tug sounded one whistle and in half a minute repeated the same, as a signal that she wished the steamer to pass on her port side.    To that signal the steamer responded, giving ·one whistle to signify her assent to that request, and immediately ported her helm, and the tug at the same time ported her own helm, turning the vessel half a point to the starboard, and became steady on her course, the tug and steamer passing each other port to port, leaving a berth between the vessels of about one hundred feet, as appears by the weight of the testimony.

Undisputed proof is exhibited that the steamer ported her helm, and that she turned to the right half a point and then steadied and continued her course, and it is quite clear that there would have been no collision if the bark had ported her helm and followed the tug, and it is highly probable that the disaster would not have happened if she had kept her course without changing her helm, but she neither ported her helm nor kept her course, as is fully shown by the evidence.    Instead of turning to the right, as she should have done, she starboarded her helm when the steamer was alongside the tug and sheered to port, shutting out from the steamer

the view of her red light and showing only her green light, and continued on that course till she struck the steamer. Orders were given by those in charge of the steamer to put her helm hard-a-port, but it was too late, and the collision took place.

Many theories have been advanced by the claimants as showing that the bark did not sheer, but it is not possible to adopt any one of them without rejecting conceded facts or facts fully proved, or without coming to the conclusion that the two vessels did not collide, which would be in direct conflict both with the libel and answer and the testimony of every witness in the case who was present when the steamer sunk in the river.

Ingenious efforts are also made in argument to show that the berth between the steamer and the tug when they passed each other was not so great as that represented by the libellants. Suppose that theory be admitted, still it cannot benefit the claimants, so long as it is conceded that the distance between them at the time was sufficient to enable them to pass in safety, and that the steamer, while they were abreast, ported her helm and turned to the right, which is as satisfactorily proved as it is that the steamer and tug passed each other in safety.

Proved as these facts are beyond doubt, it is vain to suppose that any theory can be adopted by the court which will make it necessary for the court to shut their eyes to the evidence by which those facts are established. Suffice it to say, the collision did occur, and the court is satisfied that the wheelsman of the bark misunderstood the order to port and supposed it was an order to starboard preparatory to casting off from the tug. He knew that the bark, while she continued in tow, ought to follow the tug, but they had reached the place where vessels in tow usually cast off from the tug, and the master was engaged in adjusting the towage account, and all on deck were looking for the order to cast off, and under those circumstances it is less strange than it otherwise might have been that the wheelsman should have made such a mistake. Undoubtedly it was a great mistake,

but it has been fully proved, and it is clear that the collision would not have occurred if it had not been made.

Whether the steamer was or was not also in fault is not a question in this case, as that question was conclusively settled in the Circuit Court, but it may not be improper to remark that if she was so it was because she did not put her helm hard-a-port before she passed the tug, and the moment those in charge of her navigation noticed that the bark had shut in her red light and began to display her green light, showing that she had starboarded her helm and was turning to the left.

Errors committed by one of two vessels approaching each other from opposite directions do not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent a collision, as the act of Congress provides that in obeying and construing the prescribed rules of navigation due regard must be had to the special circumstances rendering a departure from them necessary in order to avoid immediate danger.*

Viewed in the light of that exceptional rule, the better opinion, perhaps, is that the entire decree of the Circuit Court was correct.

DECREE AFFIRMED.