: THE HERCULES.

THE BRANDON.

THE HERCULES *v.* THE BRANDON.

*(District Court, D. South Carolina.   July 29, 1892.)*

COLLISION—TUGS—MUTUAL FAULT.

The tug H., having left a ship about the middle of Cooper river, off the wharf front of Charleston, S. C., was proceeding down stream in a curve towards her berth, with her wheel hard aport.  While on this course, and about a quarter of a mile from and heading towards the wharf front, the tug B. was also proceeding downward, and much nearer to the piers, bound for her berth; below that of the H. The B. blew one blast, which was answered by one from the H., and the B. then ported.  Soon after the H. gave two blasts, not to indicate that she would direct her course to port, according to the rules of navigation, but to induce the B. to go under her stern.  The B. answered with one blast, and each tug kept its course. Collision impending, both stopped and reversed, but the B. struck the H., causing injury to both.  *Held,* that the H., having the B. on her starboard side, was bound to keep out of the way; that she was in fault in giving the two blasts, and keeping her course; and that the B. was also in fault for not starboarding, as she might have done, when she saw that the H. was crossing her bow; for under rule 23 a vessel has no right to run into collision for the enforcement of her right of way.

In Admiralty.   Cross libels for collision.   Decree for divided damages.

*Bryan & Bryan,* for libelant.

*Mitchell & Smith* and *W. H. Parker,* for respondent.

SIMONTON, District Judge.   This is a libel and cross libel for collision in Cooper river, on the wharf front of the city of Charleston.   It is well to explain the topography of that portion of this wharf front where the collision occurred.   Coming down the river to the southward, and passing a number of pier heads, with docks adjacent, we reach Atlantic wharves, with four pier heads and docks between.   Below Atlantic wharf, and next adjacent to that one of them known as "South Atlantic Wharf," is Boyce's wharf, with two pier heads and intervening docks.   Then come Adgers' North wharf and dock, and Adgers' South wharf.   Below this last are Commercial wharves.   Between each pier head is a dock wide enough to hold two seagoing vessels of size, abreast of each other. The distance between South Atlantic dock and Adgers' South wharf is nearly 300 yards.   Cooper river, at the place opposite these docks, is about a mile wide,—a little more, perhaps.

On the morning of the 29th October, 1891, a little before 7 o'clock, the steam tug Hercules left a steamship lying in midstream, opposite Atlantic wharves, started down the river, and proceeded to her own berth, at South Atlantic wharf.   Her purpose, on reaching the dock, was to back into her berth.   Her course, after leaving the steamship, was on a curve.   Her wheel was put hard aport, and she was going, her master says, at half speed, say 5½ miles an hour.   When she was on this curve, about half way from the steamship, probably a quarter of a

mile from and heading towards the wharf front, the steam tug Brandon was on her way along the wharf front going down the river, to her berth at South Commercial wharf. Seeing the lights of the Hercules, which was then off her port bow to the southeast, she herself being then off Atlantic wharf about 125 yards, the Brandon blew one blast of her whistle, which was answered by one blast from the Hercules. The Brandon then ported. The Hercules, from the time of this first blast, showed only her green light to the Brandon; and in a few seconds, after answering the blast, she blew two whistles to the Brandon, which the latter vessel answered with but one. Collision impending, both tugs stopped and reversed. They came together, just off Adgers' South wharf, the Brandon striking the Hercules on her starboard side, about 25 feet from her stern, with her bow, at a slight angle. Both tugs were injured, the Hercules much worse than the Brandon. Until the moment before the collision the tugs kept up their speed. As we have seen, that of the Hercules was 5½ miles an hour. The Brandon was going from 3½ to 4 miles an hour, and with the ebb tide.

When the facts of a case of collision are established, the application of the law is easy. The numberless cases on this subject have settled the principles applicable to it. The rules of navigation are established to prevent the possibility of a collision. In the nature of things, they cannot meet every emergency. In obeying and construing these rules, due regard should be had to all the dangers of navigation, and to any special circumstances which may render a departure from the rules necessary in order to avoid immediate danger. Rule 23. If one of the vesssls approaching each other commit errors, this will not excuse the other from using every proper precaution to prevent a collision. *The Maria Martin,* 12 Wall. 31.

In *The America,* 92 U. S. 432, Mr. Justice CLIFFORD says:

"Sailing rules were ordained to prevent collisions between ships employed in navigation, and to preserve life and property embarked in that perilous pursuit, and not to enable those whose duty it is to adopt, if possible, the necessary precautions to avoid such a disaster, to determine how little they can do in that direction without becoming responsible for its consequences, in case it occurs."

The two steamers were proceeding on converging lines,—the Brandon going down Cooper river, southwardly 125 yards from the wharf; the Hercules to the southeast of her, one quarter of a mile from the wharf, proceeding towards her own dock, opposite to which, and between it and the Hercules, was the Brandon when she blew her first whistle. The Hercules had the Brandon on her starboard side. Her duty was to keep out of the way of the Brandon. Article 16. The Brandon gave notice by her one blast that she was porting her wheel. The Hercules, answering it, expressed that she so understood. In effect, the blast said, "Your duty is to keep out of my way. To enable you to do this, I tell you what I am doing." The return blast, in effect, answered, "I understand, and will conduct myself accordingly." There is no evidence whatever that the Hercules changed her course, or took any pre-

caution to keep out of the way of the Brandon. In fact, she kept on her course, her helm hard down, without change. She blew two whistles, it is true. But these were given, not as indicating any action on her part, but to induce the Brandon to go under her stern. Article 19 provides that these blasts indicate what the vessel blowing them intends to do,—two short blasts to mean, "I am directing my course to port,"— not what the other vessel is to do. This neglect of the rule puts her in fault.

The Brandon, coming down the stream, and signaling to the Hercules, put her helm aport. But she saw that the Hercules, instead of going to starboard, was crossing her path. She saw and recognized the error the Hercules was committing. It then became her duty, notwithstanding this error, to use every precaution to avoid collision. *The Maria Martin*, *supra*. This special circumstance rendered a departure from the rules necessary. She was in close vicinity of wharves on her starboard side. Great caution, therefore, was necessary. Inspection Rules, p. 46. The green light of the Hercules was the only one visible, almost directly off the bow of the Brandon. This indicated that the Hercules was every minute getting nearer the wharves. The course of the Brandon was constantly diminishing her distance from them. It also showed that the Hercules was getting almost directly ahead of the Brandon,—in her path. A change of the wheel of the latter, from port to starboard, would have avoided all risk of collision. If no change was made, a collision was inevitable. The Brandon kept on her course without any change whatever. In this she violated article 23. The duty is to avoid the collision, by observing the rules primarily, by departing from them, if necessary, to avoid danger. The master of the Brandon says that he saw the green light of the Hercules for two minutes before the collision. If he had starboarded his wheel, he would have passed astern of her. He did not do this, and was in fault. He had no right to run into collision for the enforcement of his right of way. *The C. R. Stone*, 49 Fed. Rep. 475. Collisions involve the destruction of life, as well as of property. It is for the interest of humanity that they be prevented. All parties concerned in them should be held to rigid accountability. In order to escape all responsibility for a collision, one must be wholly without fault. He must not only be guiltless of any error, which may bring about risk of collision, but he must also take all necessary steps to avoid a threatened collision, if it be possible. It is ordered that costs and damages in this case be divided between the libelant and respondent. Let E. M. Seabrook take testimony as to the damages sustained by each tug, and report the same to this court.