## CIA. DE MADERAS DE CAI-BARIEN, S. A.

### v.

## THE QUEENSTON HEIGHTS.

### No. 2232.

United States District Court,
E. D. Louisiana, New Orleans.
May 12, 1954.

Deutsch, Kerrigan & Stiles, Francis Emmett, New Orleans, La., for libelant.

Terriberry, Young, Rault & Carroll, Walter Carroll, New Orleans, La., for respondent.

WRIGHT, District Judge.

At about 1:30 a. m. on November 21, 1952, the motor vessel, Star of Honduras, downbound, and the tanker steamship, Queenston Heights, upbound, met in collision in the Mississippi River off the town of Buras, Louisiana, at about Milepost 26, a few hundred feet from the west or right-descending bank. The night was dark and clear, making conditions excellent for seeing lights and hearing signals.

The Star of Honduras was a wartime, steel LCI, converted to a cargo vessel, length 152.3 feet, beam 23.3 feet, powered by two 150-horsepower Diesel engines. She was fully ladened with lumber and general cargo and was being navigated at the time by a Mississippi River pilot, with her master, a helmsman, and a lookout on the bridge. There was no lookout on the bow.

The Queenston Heights was a T-2 tanker in ballast, 504 feet in length, with a beam 68.2 feet. She was being navigated by a Mississippi River pilot, with her master in the chartroom, watch officer and helmsman on the bridge, and a lookout on the bow. She was in all respects seaworthy and displaying proper lights. When the vessels came in sight

of each other both were proceeding at full speed ahead, the Star making good about 9 miles per hour over the ground and the Queenston about 15 miles per hour over the ground.

Between Bolivar Light at Milepost 22 and Tropical Bend at Milepost 30 the Mississippi River is practically straight, about 2,250 feet wide, and runs generally north and south. The Alberta Light is on the west bank (M. A. H. P. 27.8) and Neptune Light (M. A. H. P. 23.9) on the east bank. Above Neptune Light there is an oil dock on the east bank at Ostrica, Louisiana (M. A. H. P. 25.7).

When in the vicinity of Alberta Light and proceeding parallel to and about 800 feet from the west bank of the river, the pilot and other deck personnel on the bridge of the Star observed the red, green, and range lights of a steamer, which later proved to be the Queenston, then in the vicinity of Neptune Light, near the east bank and some 3 to 3½ miles distant. At this time the Queenston was observed by the Star to turn slightly left and take a diagonal course which, if continued, would bring her to the opposite, or west, bank, of the river. This diagonal course, with some minor variation, was continued by the Queenston up to the time of the collision.

Assuming that the diagonal course then being taken by the oncoming vessel was for the purpose of lessening wave wash and thus preventing damage to vessels moored to the oil dock at Ostrica and in order to provide ample room for that maneuver, the Star, on an easy right rudder, brought herself to about 600 feet from the west bank and thereupon straightened up and continued on. On observing that the Queenston had crossed the middle line of the river and was still continuing her course diagonally toward the west bank, the Star, under a hard right rudder, brought herself to about 400 feet from the west bank, straightened up, and continued on at full speed ahead as before. The Queenston, however, continued on her diagonal course without change of bearing from the Star until the vessels were little more than 500 feet apart. Thereupon, on hearing what the Star's witnesses say was a two-blast signal from the Queenston, but which, in fact, was probably a danger signal, the Star sounded her own danger signal and reversed her engines on the hard right rudder. The collision occurred in less than a minute.

At the time the Star's danger signal was sounded, the ship's internal alarm was likewise sounded and, on the pilot's suggestion, the Captain ordered all men above deck to await the collision. During the time the vessels were in sight of each other the Star sounded only the danger signal, and that immediately before the collision, in spite of the fact that the Queenston was constantly under the observation of the navigators of the Star and her gradual diagonal course and heading were at all times known to them.

The Queenston, in the meantime, while in the vicinity of Neptune Light, as the navigators of the Star had assumed, had angled out from the east bank toward the middle of the river to give clearance to the oil dock at Ostrica. When in about the middle of the river approaching abreast of the oil dock, she slowed to half speed ahead, which change from full ahead was recorded on the bridge and in the engine room as of 1:26 a. m. At about this time her navigators observed the white and red lights of a vessel upstream, which later proved to be the Star, favoring the west bank of the river. It was concluded by the pilot on the Queenston that the lights observed were those of a tug pushing barges upstream rather than the lights of a vessel moving downstream. Proceeding under this mistaken belief, the Queenston sounded a two-blast overtaking signal, and the helm was put easy left, the helm movement being recorded as of 1:27 a. m. After waiting at least thirty seconds for an answering signal, the two-blast signal was repeated. It was after the second two-blast signal that the Queenston realized that the vessel observed was not a tug pushing a tow upstream but was, in fact, a vessel coming downstream. This

realization may have come from the danger signal of the Star, which the Queenston denies hearing, or from the proximity of the vessel, now not much more than 500 feet away. In any event, after realizing her mistake, the Queenston sounded the danger signal and reversed her engines under a hard left rudder. The backing of the engine was recorded by the Queenston at 1:28 a. m., and the collision itself at 1:28½ a. m. The stem of the Queenston struck the port bow of the Star about 6 feet abaft her stem.

For a considerable time before the collision, the navigators of the Star saw and realized that the Queenston was on an improper course for passing port to port as required by the Inland Rules. They mistakenly assumed, however, that the Queenston would momentarily come to the right and prepare to pass port to port. As the Queenston's gradual diagonal course continued, they became more apprehensive and less certain as to her intentions. This apprehension and uncertainty was manifested by various actions and incidents such as repeated checking of the Star's lights, the pilot's comments to others concerning the course of the Queenston, and the maneuvering of the Star under hard right rudder for the purpose of displaying more vividly her red light to the oncoming Queenston. The pilot of the Star was apprehensive, too, about the Star's whistle, having found from a prior use that it was very faint, and he thought, as he saw the Queenston on her improper course, that even if blown, it would not have been heard.

It must be owned, as counsel for respondent impliedly does, that the actions of the Queenston Heights leading to the collision are indefensible. Why a navigator in his right mind would assume, on seeing the red and white lights of a vessel favoring the west or right-descending bank of the Mississippi River, that she was a western river towboat pushing a tow ahead upriver with one of her red stern pushing lights burned out

is inexplicable. Moreover, the vessels were closing on each other with a combined speed up to 25 miles an hour. Observation of this fact alone should have been sufficient to wake the navigators of the Queenston from their dream of a western river towboat going upstream. Certainly, a casual check of the relative bearings of the two vessels, which bearings never changed from the time the vessels first came in sight of each other, would have indicated to the merest tyro that the vessels were on collision courses. Respondent suggests that the failure of the navigators of the Queenston properly to appraise the situation was a mistake of judgment rather than negligence. Assuming, but not agreeing that it was, it was a mistake of judgment which should never have been made by men charged with the navigation of a T-2 tanker at night in the Mississippi river. It was a mistake of judgment which bore on their competence as navigators. It was a mistake of judgment which demonstrates the unseaworthiness, and the fault, of a vessel so manned. Chamberlain v. Ward, 21 How. 548, 62 U.S. 548, 16 L.Ed. 211.

In addition, the Queenston was guilty of statutory faults which directly contributed to the collision. After receiving no reply to her two-blast overtaking signal, the Queenston nevertheless proceeded to undertake the maneuver by applying more left rudder and maintaining her speed. This, of course, is a violation of Article 18 of the Inland Rules, 33 U.S.C.A. § 203. Even after her second two-blast signal went unanswered, the Queenston continued merrily on her way endeavoring to overtake this phantom western river towboat with one of her red stern pushing lights burned out going upstream. And to complete the travesty, the Queenston finally rammed into the port bow of the Star without reversing her propellor.[1] If the Queenston had stopped and reversed when her signals went unanswered and not proceeded to undertake any maneuver with respect to the Star until an agreement between the vessels had been reached, as

---

1. At the time of the collision the propellor had not begun to reverse, the full astern signal having been given only 30 seconds before the collision.

she was required to do, there would, of course, have been no collision. Her failure in this regard condemns her. The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126.

■■ The question as to the fault of the Star is a more difficult one. The principle is well established that where one vessel, clearly shown to have been guilty of fault adequate in itself to account for the collision, seeks to impugn the management of other vessels, there is a presumption in favor of the latter which can only be rebutted by clear proof of contributive fault. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Victory, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519. On the other hand, it is likewise clear that initial fault of one vessel does not exempt the other from the duty of complying with the rules of navigation or of using such precautions as good judgment and seamanship require to meet the emergency. The Maria Martin, 12 Wall. 31, 79 U.S. 31, 47, 20 L. Ed. 251; The Sunnyside, 91 U.S. 208, 215, 23 L.Ed. 302; The New York, supra. Applying these principles to the case of the Star, and resisting the understandable temptation to fix fault wholly on the vessel guilty of initial and grievous fault in creating the danger of collision, this Court finds the Star also guilty of fault contributing to the collision.

It is admitted that the lookout of the Star was not in the bow of the vessel as he was required to be. The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L.Ed. 165; The Ariadne, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542; British Columbia Mills Tug & Barge Co. v. Mylroie, 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807; Chamberlain v. Ward, supra; Yamashita Kisen Kabushiki Kaisha v. McCormick Intercoastal S. S. Co. (The Yoshida Maru), 9 Cir., 20 F.2d 25, 29. It is true that the bow of this vessel near the stem is probably no more than 50 feet from the pilot house and that persons in the pilot house can see lights as well as a lookout in the bow. Nevertheless, the evidence shows that the overtaking signals sounded by the Queenston were not heard by the Star. It is possible that a lookout 50 feet forward of the men in the pilot-house, and that much farther removed from the noise of the vessel's Diesel engines, may have picked up these signals. If the Star had known of the Queenston's two-blast signal at 1:27 a. m. when it was first sounded, by appropriate action she may have avoided the collision. At least, since it has not been demonstrated that her failure to have a proper lookout could not have contributed to the collision, she could be condemned on this fault alone. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; Inland Rules, Article 29, 33 U.S.C.A. § 221.

The fault of the Star, however, is not confined to having an improper lookout. The evidence is clear that her navigators were doubtful and apprehensive as to the intentions of the Queenston. They assumed, and kept hoping, that the Queenston would momentarily come to starboard so as to pass port to port, but there was nothing in the previous action of the Queenston to justify such assumption or hope. The Queenston's diagonal course across the river, once undertaken, was not deviated from, and the Star, completely without knowledge of the Queenston's intentions, continued on full speed ahead without sounding a signal of any kind until in the very jaws of collision. The danger signal, then sounded, came too late. The pilot of the Star knew it was too late because, at the same time the signal was sounded, the crew was ordered to stand by topside to await the collision.

The danger signal is not intended as a substitute for an order to prepare to abandon ship. The rule provides that it should be sounded whenever a vessel is in doubt as to the course or the intention of an approaching vessel. Inland Rules, Article 18, 33 U.S.C.A. § 203. Its purpose is to resolve the doubt before the danger of collision arises, not after collision is inevitable.

As a matter of fact, normal procedure would require that passing signals be

exchanged between approaching vessels long before the necessity for a danger signal arises.[2] Apparently, such a procedure never occurred to the navigators of the Star. They seemed intent merely on keeping the Star out of the way of the Queenston by heading her for the west bank of the river, the same bank to which the Queenston's undeviating course was rapidly taking her. Perhaps, as her pilot suggests, the Star's failure to sound signals did result from lack of confidence in their being heard, but that fact would magnify rather than mollify her fault. Unfortunately, however, there seems no other rational explanation why the whistle was not used.

This court is convinced that had the Star sounded adequate passing signals and danger signals at appropriate times there would have been no collision. In any event, it has not been demonstrated that these statutory faults on her part could not have contributed to the collision. The Pennsylvania, supra.

Both to blame. Decree accordingly.

2. Inland Rules, Article 18.