## BRITISH COLUMBIA MILLS TUG & BARGE COMPANY *v.* MYLROIE.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 190. Argued March 23, 24, 1922.—Decided May 15, 1922.

1. A vessel, off her course on a dark and stormy night in the vicinity of dangerous shores, is held to the highest degree of vigilance in maintaining the most effective lookout. P. 7. *The Ariadne*, 13 Wall. 475.
2. In this case there was negligence in stationing the lookout in the wheelhouse only when a better opportunity to see ahead was afforded at the bow. P. 6.
3. Upon the evidence, *held*, that the petitioner's tug was guilty of negligence in taking her tow, the respondent's barge, dangerously near to the shore, and in then changing her course by a right angle suddenly, without a warning signal, with the result that the barge's shackle, to which the tow-line was attached, gave way under a sudden lateral strain and the barge was cast adrift and grounded. P. 4.
4. A towage contract providing that a tug will render reasonable assistance to a barge from time to time in any emergency, and whilst at anchor be within call to render such reasonable assistance, but that the tug owner shall not be liable for any damage to the barge or cargo while in tow or at anchor, is to be construed as

1

leaving the tug liable for damage to the barge or cargo, while in tow, due to the tug's failure to render reasonable assistance to the barge in an emergency.  P. 11.

268 Fed. 449, affirmed.

CERTIORARI to a decree of the Circuit Court of Appeals which reversed a decree of the District Court dismissing a libel *in rem* filed by the present respondent, against a tug owned by the petitioner, to recover for damage to the respondent's barge and its cargo, resulting, as it was alleged, from the unseaworthiness of the tug and the negligence and want of skill of those in charge of her.

*Mr. W. B. Stratton,* with whom *Mr. C. H. Farrell* and *Mr. J. H. Kane* were on the briefs, for petitioner.

*Mr. William H. Gorham* for respondent.

MR. CHIEF JUSTICE TAFT delivered the opinion of the court.

This case was begun by a libel *in rem* filed by A. W. Mylroie, the respondent herein, as owner of the American barge " Bangor ", and lawful bailee of its cargo, against the British tug " Commodore ", in the District Court of Alaska.  The libel, as later amended, charged, in substance, that the Commodore was engaged in towing the Bangor on a voyage from the international boundary between British Columbia and the State of Washington to Anchorage, Alaska; that the tug at 2 o'clock in the morning on March 26, 1917, being then in Alaskan waters, and out of her course in heavy wind and sea and a snow storm, sighting land immediately ahead, put her wheel hard over and under a full head of steam suddenly changed her course to avoid the rocks and reefs on the shore of Mary Island; and that by reason of the snapping strain due to the sudden change of the tug's course, the barge's shackle by which the towline was attached to the barge, was broken; that the barge drifted and

grounded on Mary Island, Alaska, with consequent damage to the barge and cargo, all through the negligence and carelessness and want of skill and want of knowledge of the waters on the part of those in charge of the tug, and also because of the lack of seaworthiness of the tug, in that it did not have a full complement of men sufficient to keep a proper lookout at the bow of the boat.

The petitioner joined issue upon these allegations by denying negligence, lack of skill and unseaworthiness, and charged the stranding of the barge, with the consequent loss, to the unseaworthiness of the shackle which had been furnished by the barge owner. The tug owner further set up the defense against recovery that he was exempted from liability for negligence because of a clause of the towing contract.

The District Court found for the owner of the tug and dismissed the libel. It did not find it necessary to determine the effect of the exemption clause of the towing contract, because, from a preponderance of the evidence, it found that there was neither negligence nor lack of skill on the part of the tug, and that the accident arose from the breaking of the shackle, which was furnished by the barge owner, and that he had not sustained the claim that it was subject to unusual or unnecessary strain through the negligence of the tug. The Circuit Court of Appeals reversed the action of the District Court, and took an entirely different view of the effect of the evidence. It found that the tug was unseaworthy in that it did not have a large enough crew to station a lookout at the bow, and that, if it had done so at a time when the emergency required it, it could have avoided putting itself and the barge in the position of danger which resulted in the loss of the barge. It found further that the shackle was a new one with a year's test and that its breaking was due to the strain caused by the sudden change of the course by the tug when it sighted

the rocks of Mary Island immediately ahead, and within dangerous proximity, and put its helm hard down without notice by whistle to the barge to enable the barge by putting its own helm hard down to save itself. It held, moreover, that the clause of the contract relied on by the tug owner exempting him from responsibility for loss to the barge while in tow was void and could form no defense.

We have read the voluminous evidence in this record and have compared with care the findings of the two courts. After giving due weight to the findings of the court which heard the witnesses, the examination satisfies us that the District Court was influenced too much by the mere preponderance in number of the witnesses for the tug owner, and that it did not sufficiently consider the significance of certain conceded facts in sustaining the evidence of the fewer witnesses for the barge owner. It was established without contradiction that the night was a dirty one; that there was a succession of snow squalls; that it was very dark; that the proper course of the vessel was from Tree Point Light to a point two or three miles off Mary Island upon which there was a light having a wide radius of observation; that the distance from Tree Point Light to the place of the wreck was 18 miles, and that the actual course of the vessel in going that 18 miles was more than two miles nearer to the shore of Mary Island than it should have been. There was a following wind of at least 30 miles an hour. In the distance which the navigators of the vessel calculated she had run, she would have picked up the Mary Island Light a considerable time before the accident, had she been on her right course. This delay in picking up the light should have advised them that she was out of her course and in dangerous proximity to the shore. Their calculations showed that they were only 16½ miles from Tree Point Light when they had really made 18.

They did not put out a taffrail log, excusing this on the plea that it was not the custom and would not aid them. They did not try echo signals because they said it would have done no good. They did not try the lead to feel the depth and proximity to shore. No explanation is given of why they departed so far from their course. Suggestions are made of hidden currents, but none are shown to exist there. Several of the expert witnesses called by the tug owner in excusing the conduct of those in charge said that they frequently had found difficulty in making this passage by Mary Island and were often out of their course. If that is true, and the place is a dangerous one, then it called for additional care on the part of the tug.

The tug had a captain, a mate and a pilot, so-called, who had shipped as a purser. His name was Bjerre. The captain's name was Johnson, and the mate's name was Dawe. Bjerre was pecuniarily interested in the company which owned the tug, was its shore captain and went along to help the captain of the tug, as he explained, because the captain of the tug was not used to outside work—that is to work in the open ocean, and part of the trip would be in the open ocean. On the stand, Bjerre praised the seamanship of Johnson somewhat extravagantly, and then on cross-examination was obliged to admit that, in a subsequent towage of the same barge, he had to discipline Johnson for getting drunk on shore and coming to the vessel drunk—an impeachment of his unstinted praise. It is difficult to avoid the impression that Bjerre went on the trip because the company was not certain of Johnson's capacity to do the work safely. This seems to have been understood by the crew and explains why it was that the helmsman said that he obeyed the orders of Bjerre, and why the mate explained that he obeyed Bjerre's orders, because he represented the owners. Indeed the vessel seems to have had two captains.

The evidence shows that, on the night in question, Bjerre and Johnson were both in the wheelhouse; that the mate was there sometimes, and that a helmsman named Charles Croft was at the wheel. Johnson and Bjerre were constantly conferring as to the course and Bjerre professed to be the lookout. The wheelhouse was forty feet from the stem, and eighteen feet above the deck. There was no forecastle on the bow, and there were some obstructions there, but nothing that a man of ordinary height could not have seen over if at the bow, and there was no obstruction to the sight from the wheelhouse. Bjerre testifies that, in addition to the snow squalls that night, the following wind had blown the peculiarly dirty smoke, due to the kind of coal they were using, in front of them and thus produced greater obscurity. This, Bjerre says, had cleared up to some extent because at 1 a. m., as the log shows, they slowed down, though the distance made conflicts with the suggestion of a great reduction of speed. Through all this difficulty of vision, the tug was attempting to make its course and find land.

There was expert evidence that a lookout could see from the wheelhouse better than from the bow; though some of the experts for the tug testified that under circumstances like these they would have sent a man to the bow as well. We agree with the Court of Appeals that this was a case where a lookout should have been stationed at the bow, and that the difference in position between those in the wheelhouse and the man at the bow would have offered greater opportunity to pick up the land by either the one or the other than where the eyes of the tug were in the wheelhouse only. The emergency was such that the greatest care of this kind was necessary to avoid disaster. It is probable that if a lookout had been put at the bow, he might have seen the rocks for which they were headed at a greater distance than they were seen by Captain Bjerre. Bjerre says he sighted land

when it was half a mile away and Captain Johnson agrees with him.   He is contradicted in this by the helmsman and the supercargo of the barge and the subsequent event.

The injunctions with respect to the necessity for a look-out devoting his whole attention to the situation ahead, contained in the opinions of this court, are so many that it is hardly necessary to refer to more than one, that of *The Ariadne,* 13 Wall. 475, in which Mr. Justice Swayne used this language:

" The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend.   A moment's negligence on his part may involve the loss of his vessel with all the property and the lives of all on board.   The same consequence may ensue to the vessel with which his shall collide.   In the performance of this duty the law requires indefatigable care and sleepless vigilance. . . . It is the duty of all courts, charged with the administration of this branch of our jurisprudence, to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary."

Attempt has been made in argument to distinguish cases in which this rule has been applied from the one at bar, on the ground that they were cases in crowded harbors where collisions might have been expected unless great care was taken.   Certainly no such distinction can be given weight in this case.   A lookout is for the purpose of seeing and advising those navigating the ship of what is in the way, and the danger on a night like the one here presented an exigency requiring the peculiar services of a lookout quite as much as in a crowded harbor.   We agree with the Court of Appeals that the dangerous situation in which the tug and her tow were brought can be reasonably charged to the absence of a proper lookout.

We come then to the question, what caused the break-
ing of the shackle?   As to that, there is a sharp conflict
of evidence between the helmsman, Charles Croft, Captain
Johnson and Captain Bjerre.   Croft testified for the barge
owner and the District Judge said his honesty made an
impression on him.   Croft said that Bjerre jumped to
the wheel and took it out of his hand, and put the wheel
hard aport, with the statement "You are too darned
slow ", that he looked out and saw mist on the water look-
ing like wash upon the rocks, that shortly after the turn,
he felt a jar, and asked what it was, that Bjerre answered
" We have lost the tow ", and then within a short time
when Captain Johnson came, he repeated " The damn tow
is gone."   Johnson and Bjerre would give the impression
in their evidence that Bjerre made out the land about half
a mile away, that he ordered the helmsman to change
their course two points only, and it was sometime after
that when the mate came in and reported that the tow
was gone.   They said that there was at no time any jar.
They said that Croft's story applied to what happened
after they had lost the tow and had turned and gone to-
ward the shore to her assistance when suddenly they
heard the surf and then had to put their helm hard down
to avoid going ashore.   Croft is not shown to have had
any motive to misstate his evidence or to pervert facts.
It is not a situation that he would be likely to forget.
The relation and order of events were so clear that they
would naturally remain in his mind.   Johnson and Bjerre
both had very strong motives for their story.   The most
noteworthy circumstance, however, supporting Croft and
shaking the credibility of the two captains, is that though
Bjerre and Johnson kept the log, they made no note
whatever of the change of course of two points, so that the
log does not show anything except " 1.45 Barge broke
away."   The omission of what it was most natural they
should have put down, if it were such a leisurely change

as they testify, and one not in excitement and hurry, gives much the greater weight in our judgment to the evidence of the helmsman. It is an indication that the present story is one of later origin than that night. The statement of the helmsman is supported too by the evidence of the men on the barge, who testified to the jar that they felt and then the breaking of the shackle.

A part of the shackle was recovered. The uncontradicted evidence is that it was bought from a ship chandler a year before and had been tested by service during that period. Experts were called to testify as to inferences to be drawn from the character of the break in the shackle. The most satisfactory witness was called by the barge owner who made the laboratory test and said positively that the break was due to crystallization caused by a sudden strain. The test showed that an arm of the shackle had a tensile strength of 47 tons and less than that of the tow line. On cross-examination, the tow's witness conceded that if the strain was straight and direct and steady, the tensile strength by the two arms of the shackle might be doubled, but not so if the strain fell on one side or the other. As the strain here was necessarily on one side, the shackle became the weakest link in the chain between the tug and the tow.

The Circuit Court of Appeals found that the breaking of the shackle was due to additional strain or snap of the sudden change of course, and we concur in this view. The change of course by 90 degrees or at a right angle as this was would probably slacken the tow line at first as the tow proceeded on its course and the tug veered, but the progress of the tug on the new course would take up the slack with a jerk.

The respondent's counsel charges negligence on the part of the tug in not giving notice to the tow of the sudden change of course by whistle. Expert evidence was called on behalf of the tug to show that this was

not the custom. Indeed it is not too much to say that the expert evidence in this case as to customs prevailing in navigation in those difficult inside passages on the British Columbia and Alaskan coast indicate such a laxity in the use of precautions that we are not inclined to credit it and certainly not to dignify such alleged customs into a standard of due care. The evidence as to the absence of necessity for the use of signals between tug and tow was not satisfying. Indeed, it was admitted that at least one of the great towing firms of that region had departed from the so-called custom and had prepared a set of signals to be used between tug and tow and that this set of signals was on the tug that night. It was not denied that an ordinary signal that the tug was about to change her course would have notified the tow of the maneuvre. We agree with the Circuit Court of Appeals that under the circumstances, and in the great emergency, it was negligence not to have warned the tow. Had the tow put her helm hard down, there is every probability that it would have avoided the strain and the break in the shackle.

Counsel on behalf of the tug owner press us with the argument that there was a device on the tug for taking up and letting out the tow line automatically to relieve the strain and that this had been set in operation that night. The mate testified that he had his hand on the tow when he felt the jar of the break. If he had his hand on the tow line, it is quite evident that it could not have been paying out fast and clearly it did not relieve the strain.

We conclude that the tug was guilty of negligence in taking her tow dangerously near to the shore from which though she was able to escape, she did not help her tow to escape as she might have done by due warning. If she be liable for negligence, she must pay for the loss to the tow and her cargo.

This brings us to the question how far the tug is exculpated from liability for negligence by the contract. The clause of the contract relied on by the tug owner is as follows:

" 3. That the Tug will render to the said Barge ' Bangor ' reasonable assistance from time to time in any emergency which might arise, and while discharging at Anchorage the Tug is to be within call of the Barge at all times to render such reasonable assistance in case of any emergency which might arise. The Tug Company is not to be held liable for any damage which might happen to the said barge ' Bangor ' or its cargo while in tow or at anchor."

The agreement of the tug to render to the barge reasonable assistance from time to time in any emergency which might arise, and the exemption of the tug company from liability for any damage which might happen to the barge or its cargo while in tow, seem in conflict, but it is our duty to reconcile them if we can.

In *Elderslie S. S. Co.* v. *Borthwick* (H. of L.), 10 Asp. Mar. Cas., N. S., 24, 26, the House of Lords was called upon to declare the legal effect of a contract of affreightment with an exemption clause relieving the ship, owners and charterers from liability for negligence of the master or other person in their service, together with a provision that excepted loss or damage from defects in hull if reasonable means had been taken to provide against such defects. Lord Chancellor (Halsbury), in considering these provisions apparently in conflict, used this language:

" The true construction of the clause is, according to my view, that he is to be exempted from any liability for the particular injury that has happened, and if that had stood alone I should have thought it perfectly clear that he was not to be liable; but instead of that, he goes on to say in another part of the same contract, to which I must, if I can, give some effect because of that rule of

construction from which I cannot escape: ' I shall not be liable for this same injury (as I must call it) if all reasonable means have been taken to avoid it.' The only mode of reading as an entire contract that instrument which has those two stipulations in it, is to suppose that you must read the first part of it thus: ' I am not to be liable for this,' and then what comes after it by way of exception, ' I shall not be liable unless I have failed to take all reasonable means against the injury that has happened.' In that way you can read the two together, and you can make a reasonable contract out of it."

Dealing with the clause in this case in the same way, we must read it to mean that the tug was not to be held liable for any damage which might happen to the barge or its cargo, while in tow, unless the tug should not render reasonable assistance to the tow in an emergency. As our view of the evidence results in the conclusion that the negligence of the tug in not providing a proper lookout created the emergency and that the tug did not render proper assistance to the tow in the emergency so created, the tug is clearly liable for the loss. This makes it unnecessary for us to consider the contention on behalf of the barge that the exemption clause is void.

The Circuit Court of Appeals directed a decree for the owner of the tow and sent the case back for a more satisfactory assessment of damages. We brought the decree here by certiorari under § 240 of the Judicial Code. We now affirm the decree and remand the case to the District Court for assessment of damages in conformity to the mandate of the Circuit Court of Appeals.

*Affirmed.*