**OREGON–WASHINGTON BRIDGE CO. v. THE LEW RUSSELL, Sr. et al.**

No. 13051.

United States Court of Appeals
Ninth Circuit.

May 6, 1952.

Gray & Lister and H. Lawrence Lister, Portland, Or., for appellant.

Wood, Matthiessen & Wood, Erskine Wood and Lofton L. Tatum, Portland, Or., for appellees, The Lew Russell, Sr. and her owner, Russell Towboat & Moorage Co.

Thomas J. White, and William F. White, Portland, Or., for appellees, Crane Barge No. 25, and her owner, Russell Family, Inc.

Before DENMAN, Chief Judge, and BONE and POPE, Circuit Judges.

DENMAN, Chief Judge.

This appeal is taken by the libelant, Oregon-Washington Bridge Company, from a decree in admiralty that its libel against the respondents, Russell Towboat and Moorage Company and Russell Family, Inc., be dismissed and that the respondent, Russell Family, Inc., which had filed an inter-

vening libel, recover from the libelant the sum of $3,306.11 for injury to a crane belonging to Russell Family, Inc. The libelant is owner of a bridge crossing the Columbia River at Hood River, Oregon; the respondent Russell Towboat and Moorage Company is claimant of the tug, "Lew Russell, Sr."; and the respondent Russell Family, Inc. is claimant of Crane Barge No. 25 and intervening libelant against the Bridge Company. The appellant contends that the district court erred in holding that libelant's negligence was the cause of the damage resulting from the collision of the tug and barge with the bridge, and that the respondents were not negligent.

The Hood River bridge was opened in 1924. It had no lift span originally, but when Bonneville Dam was built a few miles downstream, the level of the Columbia River was raised to such an extent that it became necessary to have a lift span. Such was built in 1940 under the direction of the War Department and at federal expense. At the center of this span was a light which turned red when the span started to lift and which turned green when the span reached its maximum height. An air whistle operated by electric motor was also installed on the bridge. The bridge tender's house was just north of the lift span and about 25 feet above the roadway.

Regulations of the War Department required twelve hours' notice to the bridge tender from any river craft which could not pass under the bridge at its normal position. The call for the opening of the span when the craft was in position to pass was one long, two short and one long blast. The twelve hours' notice for an 8:30 A. M. passage was given by the tug; but the tug did not arrive at the appointed hour. Three hours later, the bridge tender spotted it moving upstream, called an electrician to stand by, and proceeded to raise the span without a signal from the tug.

When the span had risen 13½ feet from the roadway, the electric power supplied by a Public Utility District failed through no fault of the bridge. The air whistle supplied from this same source of electric energy also failed as did the red light at the center of the span. The bridge tender rushed out of his control tower 25 feet above the roadway and shouted and waved to the tug which by this time had begun to approach the bridge on the assumption that the lift span had been raised to the correct height by the tender. The warning was not observed by the pilot of the tug.

As the tug approached the bridge, it was pushing a gravel barge directly ahead of it and Crane Barge No. 25 forward and starboard of the tug. The crane barge was 200 feet long and it was carrying a crane welded to its deck about 50 feet from the stern. A boom 110 feet long extended upward and forward from the crane and it was loaded with a small L.C.M. When the tip of the boom was about 25 feet from the bridge, the pilot realized that it was about 3 feet short of clearance under the lift span. He reversed his engine, too late to prevent the impact, and it is alleged that the bridge was damaged to the extent of some $30,000.

The district court held that the bridge was negligent in not maintaining an emergency or auxiliary signaling device which would operate independently of the power source which supplied the lift span itself. We agree with the court's conclusion. The bridge is required to exercise due care under the circumstances; and it is undisputed that the electric power supply to the bridge had failed at least twice in the preceding one and one-half years. The district court found that it had failed at least three times previously. With this experience in mind, a prudent bridge owner would have realized that his signaling whistle would fail if power to the lift span failed and would have taken steps to secure an auxiliary device.

The libelant makes several attacks on this conclusion that the standard of due care required an auxiliary signal. The first is that there is no proof that a whistle would have been heard if one were available. This is the same kind of problem that faced the court in The T. J. Hooper, 2 Cir., 60 F.2d 737, where Judge Learned Hand held that ocean-going tugs would have to be equipped with wireless receiving sets in order to discharge their duty of seaworthiness. It was guesswork to some extent for him to say that if the tugs in that case

had carried wireless, the damage caused by storm could have been averted. The wireless might have failed, as indeed private radio receiving sets aboard the tugs had, or the tug masters might not have believed weather warnings received on the wireless. In our case, it was shown that other bridges crossing the Willamette River had auxiliary warning devices which were commonly used. Since it was also testified that the tug could have stopped in one-half the length of its tow, or about 100 feet, a warning whistle at rather short quarters would have turned the trick. In any event, there is no reason to suppose that the district court specifically required a whistle as the auxiliary warning. It did not say so; and the regulations of the War Department applied to this bridge subsequent to the accident have specified a red flag as the auxiliary warning device, rather than a whistle.

■ No provision was made in the regulations by the War Department for auxiliary warning devices at the time of the collision. Complete fulfillment of these regulations by the bridge operator does not meet the standard of care in this case, however. The regulations of the War Department do not purport to set the ultimate standard of care in civil actions; and in the absence of a preemption of this function by the department, the courts must determine the standard of care in this civil action. The emphasis of the regulations is upon the action of the bridge operator in preventing the bridge from being an obstruction to navigation.

The lift span was seldom required to be raised for the passage of river craft and the libelant argues that the possibility of a power failure during the raising of the lift span was remote. This is true as a matter of probability; but it cannot be gainsaid that such an occurrence was shown to be a foreseeable event because of the past experience with power failures on this particular bridge. Since a slight act on the part of the bridge operator was necessary to prepare for this forseeable although improbable happening, the bridge operator was negligent in not doing that act.

The libelant argues that neglect of the tug and barge also contributed to the damage because the tug (1) should not have proceeded after the lift span stopped on the assumption that it was high enough, but should have awaited the bridge's affirmative signal to proceed, and (2) should have had a lookout other than the pilot.

■ The tug did not give the signal to open which was prescribed by the regulations, but this was immaterial here since the lift span was raised without a signal. Having observed the raising of the lift span and its stopping, the tug pilot was entitled to assume that the bridge was ready for the tug's passage, in the absence of any circumstances to warn him of the danger. The Louise Rugge, 3 Cir., 234 F. 768; The Kard, 3 Cir., 38 F.2d 844, 848. This is like the case where a tug has given a signal to open and may then assume in the absence of a warning to the contrary that the draw bridge will be timely opened. Clement v. Metropolitan West Side El. R. Co., 7 Cir., 123 F. 271. The rule is not changed here because the bridge was in the custom of giving a blast to proceed. The testimony on the existence of this custom on the part of the bridge is in the record; but in any event there is no evidence that the custom was communicated to the Columbia River craft and indeed there is testimony by the libelant's witness that he had no knowledge of any notice of the custom being given to the Columbia River craft. Consequently, the tug was not required to wait for an affirmative signal to proceed.

■ The captain of the tug was standing alongside and 7 feet below the pilot watching the approach to the bridge. The appellant charges negligence in failing to have a lookout at the bow of the barge carrying the uplifted crane. If a lookout at the bow could have observed the danger sooner than the pilot and the tug's captain, then the tug would probably be at fault. As the Supreme Court said in British Columbia v. Mylroie, 259 U.S. 1, 7, 42 S.Ct. 430, 432, 66 L.Ed. 807, "The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend." That case also involved the striking of a fixed thing, land, and is more apposite to our case than other cases cited to us which deal with

navigation on the open sea or collision between moving vessels. In the Mylroie case, the tug was proceeding through foul weather and off its course without a lookout, and it is clear that a lookout in the bow would have sighted land sooner than the pilot whose vision was obscured by a dirty coal smoke. Furthermore, the vessel was apprised of danger and knew that it was faced with an emergency situation.

In our case, we have no caution born of danger brought home to the crew of the tug. Their approach to this bridge was like dozens of others previously made. The pilot was in the pilot house in the bow of the tug about 25 feet above the level of the water. Directly ahead of the tug was a loaded gravel barge and to the starboard and forward of the tug was Crane Barge 25. The total length of the tug and tow was about 265 feet. The pilot of the tug testified that to bring them to a dead stop, it required half the length of the tow. The end of the crane was 3 feet above the lower side of the lift and a few feet ahead of and 70 feet above the bow of the barge. A lookout could not have determined the 3-foot difference until just before the moment of impact, certainly not until nearly the end of the 100 feet of stopping distance. A lookout would not have improved the situation. The Catalina, D.C.S.D.Cal., 18 F.Supp. 461; cf. The Blue Jacket v. Tacoma Mill Co., 144 U.S. 371, 12 S.Ct. 711, 36 L.Ed. 469; The Nacoochee, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687.

The decree is affirmed.