**KOCH–ELLIS MARINE CONTRACTORS, INC., Libellant,**

v.

**THE Steamship CAPETAN DIMITRIS, etc., Respondent.**

**PAN-AM SOUTHERN CORPORATION, Libellant,**

v.

**THE Steamship CAPETAN DIMITRIS, etc., Respondent.**

Nos. 2834, 2835.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 15, 1959.

Cobb & Wright, Joseph V. Ferguson, II, New Orleans, La., for Koch-Ellis Marine Contractors, Inc.

Deutsch, Kerrigan & Stiles, Joaquin Campoy, New Orleans, La., for Pan-Am Southern Corp.

Terriberry, Rault, Carroll, Martinez & Yancey, Walter Carroll, Jr., New Orleans, La., for respondent.

J. SKELLY WRIGHT, District Judge.

In navigating the tortuous Mississippi River below New Orleans, the judicially recognized custom is that the upbound vessels come up under the points and the downbound vessels run the bends.[1] This is a rule of prudence dictated by the fact that the current in the Mississippi runs downstream into the bends, leaving slack water under the points. The effect of this rule, however, is, in some instances, to require vessels to cross the river diagonally from point to point, or from bend to bend, thus creating a hazard to the navigation of other vessels misunderstanding the maneuver. The collision in suit arose from such a misunderstanding.

The collision occurred at 1:40 a. m., 200 feet off the west bank of the river O, at Mile 81, just south of Twelve Mile Point, between the Tug Perry N,[2] pushing a tow of three barges[3] in tandem, and the S.S. Capetan Dimitris.[4] The Perry N was upbound. She rounded English Turn under Shingle Point on the east bank and proceeded up the east bank to approximately Mile 80. She then headed diagonally across the river to run under Twelve Mile Point on the west bank, approximately one and a half miles away. The Capetan Dimitris was bound downriver about in the middle, making 10 miles per hour and threading the main stream. As she rounded Twelve Mile Point, instead of continuing ahead favoring the middle or the east side, the Capetan Dimitris starboarded her helm and after a succession of maneuvers, which are not entirely clear, put her bow firmly into the starboard side of the Tank Barge KE–29, third in line in the tow.

Only two witnesses were produced, both from the Perry N, her captain and mate. The Mississippi River pilot in charge of the navigation of the Capetan Dimitris is dead and her captain is in retirement in Greece. No account was made of the other members of the crew. Her owner, however, did offer in evidence the testimony of the pilot and the master taken before the Coast Guard shortly after the collision, it being suggested that since the pilot was dead and the master abroad, such testimony should be admitted. Objection, of course, was

---

1. The Albert Dumois, 177 U.S. 240, 20 S.Ct. 595, 44 L.Ed. 751; Mississippi Valley Barge Line Co. v. Esso Shipping Co., 5 Cir., 240 F.2d 606; Crowell & Thurlow S.S. Co. v. Texas Co., 5 Cir., 27 F.2d 208.

2. MV Perry N—O/N 240810, an uninspected, documented, inland towboat constructed of steel, 61 gross tons, 9 net tons, 63.3' x 17.0' x 8.1', built 1941. Home Port New Orleans, La. Powered by Diesel Engine 320 HP, single screw.

Owned and operated by Koch-Ellis Marine Contractors, Inc.

3. The tow was composed of three loaded oil barges, each measuring 195' x 35' x 9.6'.

4. S.S. Capetan Dimitris—Costa Rican Flag, Lloyds Register No. 05229. Owned by Cia de Vapores, Lounidi Ltd. Home port San Jose, Costa Rica. Dimensions 400'6" x 52'4" x 25'4", 5173 gross tons, 3192 net tons, powered by steam reciprocating engine, built in 1919.

made to this unusual offer,[5] particularly with reference to the testimony of the captain, but the Court finds it unnecessary to rule on its admissibility because, considering the record with or without the proffered testimony, the Capetan Dimitris must be found wholly at fault.

There is here the usual discrepancy in the testimony of the witnesses of the opposing vessels, not only with reference to their positions at all pertinent times but also as to the signals sounded by each. The Perry N testimony suggests that after rounding English Turn under Shingle Point, she proceeded up the east bank at approximately three miles per hour until Braithwaite where she diagonally crossed. After completing her crossing and continuing up the west bank, some three or four hundred feet off, she noted the range lights of a downbound steamer somewhere between Poydras Light and Old Depot Light. Poydras Light is immediately across the river from Twelve Mile Point and Old Depot Light is approximately one mile farther up. The Perry N claims that she sounded a two-blast signal for a proposed starboard-to-starboard passing which was unanswered. She waited approximately three minutes without receiving a reply and sounded two additional blasts. A third two-blast signal was sounded, followed by a danger signal. At this time the vessel was put full astern. According to the Perry N, none of the signals was answered except the danger signal. However, after answering the danger signal, the Capetan Dimitris continued under starboard helm for a period of four minutes, finally ramming into the starboard side of the third barge in the tow.

The version of the collision as given by the witnesses for the Capetan Dimitris is interesting but incredible. They maintain that when the Capetan Dimitris first came in sight of the Perry N, the Perry N was running along the east bank and showing to her, in addition to the proper towing lights, a red running light. At this time the Perry N was somewhere between English Bend and Poydras Light. When the Capetan Dimitris came within a half mile of the Perry N, the Capetan Dimitris sounded one long whistle blast, which was answered, and directed her course to starboard a few degrees. At the time, according to the Capetan Dimitris, the Perry N was still paralleling the east bank, not far off. It then began to appear to the navigators of the Capetan Dimitris that the Perry N had started to come to the west off the east bank. Whereupon the Capetan Dimitris sounded the danger signal, followed by one blast. At this time the engines of the Capetan Dimitris were stopped. The Perry N failed to answer, so four minutes later the danger signal, followed by one blast, was again sounded and the engines of the Capetan Dimitris reversed full. However, at the time the vessels were only a ship length apart and collision was inevitable.

■■ It is obvious from the above synopses that the accounts of the collision, as given by the witnesses from the Perry N and the Capetan Dimitris, are irreconcilable. Resort must, therefore, be had to the admitted facts in determining which version has more probative value and where the fault for the collision lies. It is common ground that the collision occurred not more than 200 or 300 feet off the west bank of the 3,000-foot-wide Mississippi River. It is likewise conceded by both parties that the collision occurred just south of Twelve Mile Point. Since the Perry N was upbound, she was at the time in the position in which she was required to be under the local custom for navigating the Mississippi River.[6] This fact places a heavy burden of exculpation upon the Capetan Dimitris. She was bound in law to know the local custom and bound to comply

---

5. See The Charles Morgan, 115 U.S. 69, 77, 5 S.Ct. 1172, 29 L.Ed. 316; Steward v. Atlantic Refining Company, 3 Cir., 240 F.2d 715, 1957 A.M.C. 222; The

Dixie Sword, D.C., 57 F.Supp. 183, 1944 A.M.C. 1375.

6. See Note 1.

with it in the absence of special circumstances.[7] Instead of complying with her duty in this respect, she attempted to force a port-to-port crossing with the Perry N, possibly because so doing would place her in a better position to run the bend at English Turn, not far downriver.

It is also conceivable that the navigators of the Dimitris saw the Perry N diagonally crossing the river and were confused by this maneuver. Her experienced local pilot, however, should have known that the upstream vessel, particularly a tug pushing a tow, would be anxious for the slack water under the point and would comply with the local custom.

 Actually, and in spite of the testimony of the Dimitris to the contrary, the Perry N had, in all probability, completed her crossing of the river and was running up the west bank when she was first picked up by the navigators of the Dimitris. These navigators insisted that they saw the red running light of the Perry N from the beginning. They cite this fact as proof that the Perry N was on the east bank. Prior to coming to the turn in the river at Twelve Mile Point, however, the Dimitris was approaching from the port side of the Perry N. The Perry N would, therefore, be showing the Dimitris her red light, whichever side of the river the Perry N was navigating. The probability is that the navigators of the Dimitris simply assumed that, because they encountered the red light of the Perry N from a position around the bend, the Perry N was on the east bank of the river and, laboring under that assumption, shaped the course of the Dimitris for a port-to-port passing. This analysis is certainly more acceptable than the suggestion from the Dimitris that the slow moving Perry N, with her tow, diagonally crossed the river during the relatively short time the vessels were navigating with respect to each other.

Irrespective of the belief under which the Dimitris was laboring, the fact remains that at the time in question she was on the wrong side of the river and has not satisfactorily explained her presence there. Moreover, it seems apparent from the testimony of even her own witnesses that the Dimitris delayed reversing her engines when the danger of collision should have been obvious. The New York, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126. She not only delayed reversing her engines but continued under starboard rudder until she finally succeeded in ramming the tow of the Perry N 200 feet off the west bank.

The charges of fault on the part of the Perry N are either not proved or unrelated to the collision. For example, it is alleged that the long tow of the Perry N was without a lookout on the bow. Under some circumstances, this failure may be considered a cause of collision.[8] But here there is no question of either vessel not seeing the other in time to avoid the collision. Both vessels for several minutes prior to collision were navigating with respect to each other. Consequently, a lack of lookout on either vessel was not a causative factor in the collision.[9] Moreover, however confused the navigators of the Dimitris may have been with respect to the true position of the Perry N in the river, the Perry N was under no such disability with reference to the Dimitris. The witnesses from both vessels are as one in testifying as to the position of the Dimitris from the time the vessels came in sight of each other until the collision.

Decree for libellants. Cross libel of S.S. Capetan Dimitris dismissed.

7. The Servia, 149 U.S. 144, 153, 13 S.Ct. 817, 37 L.Ed. 681.

8. British Columbia Mills Tug & Barge Co. v. Mylroie, 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807; The Ariadne, 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542; The Ottawa, 3 Wall. 268, 70 U.S. 268, 18 L. Ed. 165.

9. Koch-Ellis Marine Contractors v. Chemical Barge Lines, 5 Cir., 224 F.2d 115; Compania de Maderas, etc. v. The Queenston Heights, 5 Cir., 220 F.2d 120.