**D. R. KINCAID, LTD., et al., Appellants,**

v.

**TRANS–PACIFIC TOWING, INC., et al.,
Appellees.**

**No. 20737.**

United States Court of Appeals
Ninth Circuit.

Oct. 19, 1966.

Robert M. Rothwell, Hoddick, Rothwell & Chang, Honolulu, Hawaii, for appellants.

Anthony B. Craven, Frank D. Gibson, Jr., Henshaw, Conroy & Hamilton, Honolulu, Hawaii, for appellees.

Before BARNES, CECIL * and JERTBERG, Circuit Judges.

BARNES, Circuit Judge:

This is an appeal from a final decree in admiralty rendered in the United States District Court for the District of Hawaii. The district court had jurisdiction of the case under 28 U.S.C. § 1333. This court has jurisdiction of the appeal under 28 U.S.C. § 1291.

D. R. Kincaid, Ltd. and Thomas A. Giuli, doing business as Kincaid-Giuli Joint Venture (hereinafter "Kincaid"), were in the process of constructing a loran station on an atoll (known as Kure Island) in the Pacific Ocean for the United States Coast Guard pursuant to a government contract. Kure Island, like many other Pacific atolls, is a stretch of submerged coral reef, round in shape, extending about four nautical miles in each direction, with less than five per cent above water, which five per cent is a sand dune known as Green Island, some twenty feet high and approximately one mile long, located at the southeast cir-

* Lester L. Cecil, Senior Circuit Judge, Sixth Circuit, sitting by designation.

cumference line of the atoll. To provide for the landing of materials and equipment, Kincaid chartered tugs and barges, the tugs being used to tow the barges from Hawaii to Midway to Kure. Outside the reef, the tug released the barge to a vessel operated by Kincaid which would tow the barge into a break in the coral near the southwest tip of Green Island to unload. When empty the barge would be towed out by Kincaid and released to the tug for the journey back to Midway and then to Hawaii.

When the construction of the loran station was completed, Kincaid was required to remove his equipment from the island. The same process was to be used, except that an empty barge was to be brought from Honolulu and returned loaded with equipment. Kincaid contracted with Trans-Pacific Towing, Inc. and Brokers, Inc. (hereinafter referred to as "Trans-Pacific") that the eighty foot tug "Port of Bandon" would tow an empty barge to Kure from Honolulu via Midway and then tow the loaded barge back to Honolulu, again via Midway.

The "Port of Bandon" completed the first half of the contract by delivering the empty barge to Kincaid at Kure Island on April 21, 1961. Kincaid took the barge into the coral break and began loading it, a process apparently requiring more than one or two days. While waiting for the loaded barge to be returned, the "Port of Bandon" attached itself to a Coast Guart mooring buoy located approximately 600 yards due south from the "landing" on Green Island. On the morning of April 22 the tug was forced to leave the buoy because of the arrival of a United States Navy tanker, which had "priority." The tug then anchored approximately 1200 yards west and slightly north and approximately 400 yards from shore; and remained there for two days.

On April 22, 1961, at noon, the Navy tanker left. On April 23, 1961, a Coast Guard boat, "The Ironwood," anchored about half way between the buoy and the tug. It left the anchorage on an emergency call the same day. On April 24 the wind and seas changed and the master of the tug, Captain Locy, decided to move to a better anchorage. In the process of weighing anchor the tug struck her bottom on something beneath the water's surface, and began to take water. The tug was beached, and became a total loss. The barge, however, remained to be towed back to Honolulu. Kincaid demanded that Trans-Pacific perform according to the contract, but Trans-Pacific took the position that its performance was excused by the loss of the tug. Kincaid then chartered another tug which returned the barge, and seeks damages for Trans-Pacific's failure to perform. The trial court found that Kincaid had not proved by a preponderance of the credible evidence that the negligence of the master of the tug had caused the loss of the tug. The court then found that the provisions of the contract with regard to the loss of the vessel excused further performance by Trans-Pacific and entered judgment for the respondent.

## I. The Exculpatory Provisions.

Both parties have argued strenuously about the effectiveness of paragraph 13 of their contractual agreement. Paragraph 13 is exculpatory in its language, and a fair reading of its terms shows that it is in essence a release of Trans-Pacific by Kincaid from any liability for damages arising from the loss of the vessel from any cause, including Trans-Pacific's negligence. Appellants argue that such a release of negligence provision is invalid as contrary to public policy. Appellees take the position that the provision is valid and enforceable. It is our conclusion that this exculpatory provision is invalid as offensive to the sound public policy recognized in the decisions of the Supreme Court of the United States and followed consistently in this circuit.

■ We need look no further for authority than the recent case of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). In that case the Supreme Court, affirming a tra-

dition going back to The Steamer Syracuse, 12 Wall. 167, 79 U.S. 167, 20 L.Ed. 382 (1871), concluded that a provision releasing the towing vessel from all liability for its negligence is invalid as contrary to an established judicial rule. The decisions of this court have been in accord. E. g., Alaska Commercial Co. v. Williams, 128 F. 362 (9th Cir. 1904); Mylroie v. British Columbia Mills Tug and Barge Co., 268 F. 449 (9th Cir. 1920), aff'd 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807 (1922). Since the contract provision was void to the extent that it limited liability for negligence, we proceed to the real point of this case, "was there negligence in the handling of the tug 'Port of Bandon'?"

## II. *The Alleged Negligence.*

■ Appellants recognize the fact that the burden was upon them, as libellants in the trial court, to prove by a preponderance of the evidence that the loss of the tug "Port of Bandon" was proximately caused by Trans-Pacific's negligence. The trial court found that the appellants had not done so, and the appellants urge reversal on the ground this finding was error.

There are no express findings as such, but we conclude from a careful reading of the entire testimony and the court's opinion that the only negligence charged against Captain Locy of tug "Port of Bandon" was conduct occurring *after* the tug left the Navy buoy. He then anchored the tug in sixty feet of water approximately 1200 yards west, and slightly north of the buoy, on a compass line 288°T (or true) from the mooring buoy. A Danforth anchor and about 400' of wire (not chain) were dropped. This was in the lee of the reef and Green Island, at a time when the wind was from the E.N.E., blowing at approximately ten to twenty knots.

Various combined legal and factual questions are raised as to what specific negligence was charged or attempted to be proved:

(1) Was Captain Locy, acting for appellees, negligent in choosing the spot to anchor, and in anchoring, his tug, after moving from the Navy buoy?

(2) Was Captain Locy negligent in not obtaining charts, in not looking at those charts, in the observations made, in the watch maintained, and in the care taken generally to reasonably insure the safety of his tug at such anchorage from noon on April 22, 1961 to the time the wind changed on April 24th, 1961?

(3) Was Captain Locy negligent in not taking compass bearings (i. e., with only a hand peloris, were visual bearings sufficient, and were they made)?

(4) Was Captain Locy negligent in not going back to the Navy mooring buoy after the Navy tanker left it vacant on April 23rd, 1961, or the morning of April 24th?

(5) Was Captain Locy warned by appellants' foreman Smith after the wind started coming up, to go back to the buoy, and, if so, was he negligent in not doing so?[1]

(6) When did the wind change from E.N.E. to E. or E. by S.; and, in view (a) of its change of direction, (b) of the ship's pivotal movement about the anchor, (c) the increase in the wind's velocity, (d) the increase in the size of seas and swells, (e) the shift to the east of seas and swells, (f) the tug's loss of the lee of Green Island, (g) the fact that the stern of the tug swung toward the reef; (h) the necessity of slacking the anchor line before taking it in—was Captain Locy negligent in failing to "dog it," i. e., in failing to move his tug farther to sea from the reef, either to the mooring buoy or to the recommended mooring?

---

1. Smith told Locy on April 23, 1961: "I think you're being a damn fool." (R.T. p. 21.) Smith testified he told him that he felt he [Locy] was too close to the reef. (R.T. p. 21.) Locy "did not recall" any such warning (R.T. p. 184), although he did have conversations with Smith (R.T. p. 182), and does not *deny* he may have had such a conversation with Mr. Smith. (R.T. p. 185, lines 4–6.)

In answering these questions, we again state that this court is fully aware the trial judge has wide discretion. Here, he pointed out in his opinion the lack of Captain Locy's experience in towing in tropical areas; his lack of experience in anchoring in coral; his mistake as to when he took photographs; his "strange lack of memory on many details" (C.T. p. 127), his lack "of adequate preparation for his testimony" (C.T. p. 128). Yet "the court believes that Captain Locey [sic] was an honest witness, notwithstanding his apparently poor memory and apparent lack of preparation for the trial." (C.T. p. 128.)

■ A conclusion as to a witness' honesty, of course, is entirely within the province of the trier of fact. He must weigh and determine. With the opportunity the trial court has to judge the credibility of witnesses testifying before him, we, as an appellate court, should not interfere, irrespective of our own opinion as to where the preponderance of evidence might be, unless we are convinced a serious mistake has been made.

We are concerned with three statements appearing in the trial judge's opinion, which were the basis of his finding of "no negligence." The *first* and most vital is this:

"The tug was on the lee side of the island [Green] protected from the wind, until about noon on April 24, 1961, when the wind got stronger and shifted so that, in order to avoid any danger of being blown ashore, the Captain, Wayne Locey [sic], decided to raise anchor and move." (C.T. p. 126.)

The testimony in the record is uncontradicted that the wind started to get stronger and shifted, *at least by daybreak* [2] (not at noon), on April 24, 1961.

The tug stayed on its anchorage until about 1:00 p. m. April 24, 1961. If the wind came up at daybreak, the Captain had six or seven hours to observe, judge, and act. If it came up at about noon he had an hour, or less. How much this misstated fact influenced the trial court's conclusion, we cannot know.

*Second:* "There is no reliable or persuasive evidence that the tug dragged its anchor. * * *" (C.T. p. 127.) There is evidence that Locy thought it did. Exhibit G, the report of the Coast Guard investigation, discloses that "Because the wind and sea had picked up and *the master thought they might be dragging anchor*, he decided to haul in the anchor and either move out to sea or anchor in the lee of the atoll." (Emphasis added.) On the trial, Locy denied his anchor dragged.[3] (R.T. p. 164.) Of course, if this conflict was decided by the trial court by balancing the evidence, then such finding of fact is ordinarily controlling on this court.

2. The "daylight" change in velocity and directional shift of wind is twice mentioned as a fact in Exhibit G—the Coast Guard Investigation Report. Smith (the only eye witness at the trial, other than Locy), testified the changes occurred at or before daylight. (R.T. p. 19.) *So did Captain Locy.* (R.T. p. 164.)

3. When questioned about his statement to the Coast Guard about whether the anchor was dragging, Locy said:
"Q. * * * the Coast Guard report we are referring to states as follows: 'Because the wind and sea had picked up and the master thought they might be dragging anchor he decided to haul in the anchor and either move out to sea or anchor in the lee of the atoll.' At that time, did you think you might be dragging anchor?

"A. I was beginning to get worried that we were going to start dragging anchor, and the seas were picking up. It was getting to be very uncomfortable. Also, that there was, also, the possibility that we would start dragging anchor very shortly.

"Q. Did you feel that you were already dragging?

"A. I don't recall if we had drug materially, no.

"Q. I will try again, Captain. Did you feel that you had dragged anchor at all since you had first put down the anchor?

"A. To my knowledge, at this time, I don't recall of it, no." (R.T. p. 219, lines 4 to 22.)

*Third:* The court's opinion stated:

"Assuming, for the purpose of discussion, and without inferring it to be true, that Captain Locey [sic] was negligent in anchoring where he did on April 22, 1961, such assumed negligence would have related only to the danger of the tug's being blown on the reef. But the evidence strongly indicates that the tug was not blown onto the reef. Although the evidence does not disclose exactly what solid object was encountered by the tug, most probably it was a coral head. It does not appear that the danger of striking a coral head was any greater in the place Captain Locey [sic] chose to anchor, than, for example, in the area of the Coast Guard buoy. * * *" (C.T. p. 128.)

Whether the tug hit the reef or a coral head or any other unidentifiable object, the tug hit something projecting from the depths which it would not have hit had Captain Locy decided to run for it— to "dog it"—to go to the open sea, before his tug was close to danger.[4] An anchorage to the mooring buoy would be *farther* at sea (by 150 yards) than the 450 yard anchorage, and hence less dangerous. Thus, assuming negligence, we cannot dispose of the issue of proximate cause as readily as it was done in the trial court.

Perhaps the statement by Locy at the trial that he did *not* drag his anchor was more persuasive than his statement to the Coast Guard immediately after the accident; and perhaps Captain Locy need not have considered running to the open sea, but should have, in the required exercise of due care, only have "run" from his point at the shore end of his 400' anchor line (anchored 450 yards from the barrier reef) to the mooring buoy, anchored 600 yards from that barrier. The determination of these matters, is within the sound discretion of the trial court. But in view of the inaccurate statement of fact, appearing in the

court's opinion as to *when* the wind changed (a matter which we believe to be the single most important fact in determining the issue of negligence), we feel we must, and do, reverse and remand for a new trial.

We do not disturb the trial court's conclusion that when Trans-Pacific decided to take advantage of its right to terminate the contract by reason of the loss of its tug, it abandoned its right to layover time. The denial of the counterclaim is affirmed.

Remanded.

---

4. This was one of the safety measures Locy agrees he could have taken. The only expert testimony was that Captain

Locy should have "run" when the wind changed at daylight. (R.T. p. 119.)