**FEDERAL STEAM NAVIGATION COMPANY. Ltd., Plaintiff,**

v.

**The TUGS SAVANNAH and ROBERT W. GROVES, Their Engines, Boilers, etc., and the Atlantic Towing Company, Defendants.**

**Civ. A. No. 2198.**

United States District Court
S. D. Georgia,
Savannah Division.

Nov. 4, 1969.

W. Spencer Connerat, Jr., E. Ormonde Hunter, Savannah, Ga., for plaintiff.

Julian C. Sipple, Savannah, Ga., for defendants.

1294

## ORDER

LAWRENCE, Chief Judge.

In this admiralty action Federal Steam Navigation Company, Ltd. seeks to avoid the contractual exclusion of liability which immunizes the defendant towboat company from responsibility for damages to vessels as the result of acts or orders of its docking-masters in docking or undocking ships at Savannah. The exculpatory provision, which is generally referred to as the "pilotage clause," is similar to those used by towing companies in every port on the Atlantic, Gulf and Pacific seaboards. When a docking-master goes aboard a vessel assisted by a tug he becomes, under its terms, the servant of the shipowner in supervising the operation.

The ship involved was the *Devon*, a cargo vessel approximately 495 feet in length with a gross tonnage of around 10,000 tons. On August 3, 1966 she was being undocked, with the assistance of two of defendant's tugs, under the orders and direction of its docking-master who was stationed on her bridge. In coming out of her berth under her own power the *Devon* apparently obtained too much way and ran aground on the north bank of the Savannah River with resulting damage for which plaintiff sues.

The issue of negligence on the part of the docking-master is not involved as I decided to try at this stage only the second defense interposed by Atlantic Towing Company. It is to the effect that the *Devon* was under her own propelling power and hence, under the contract, its docking-master, on boarding her, became and was the servant of the ship and of the owner and not of the towboat company in handling the vessel and giving orders to the assisting tugs, *Savannah* and *Robert W. Groves*.[1]

The unanimous decision of the Supreme Court in 1932 in Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, stands squarely in the way of what plaintiff urges me to do. There it was said: "The provision that its tug captains while upon the assisted ship would be the servants of her owner is an application of the well-established rule that when one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former. * * * It would be unconscionable for petitioner upon occurrence of a mishap to repudiate the agreement upon which it obtained the service." *Id.*, 294f, 53 S.Ct. 136. Realizing that this is seriously at odds with their position, counsel for the shipowner have launched a full-scale attack on that decision. It is assaulted frontally and by flank. I am asked to disregard it because it is "bad law" and runs counter to the decision in The Syracuse, 12 Wall. 167, 79 U.S. 167, 20 L.Ed. 382 and its progeny, including Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911.

In the latter case the Supreme Court reversed a ruling below in a barge tow case and held that a towboat owner may not validly contract against all liability for his negligent towage and further that the rule against contractual exemption in such cases cannot be defeated by the fiction that employees of the towboat

1. In a letter written this year I said: "At the time of the argument of the motion on January 9th I meant to convey to counsel that I intended to hold an evidentiary hearing confined to the exculpatory clause. In my opinion, *Sun Oil* [Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311] is determinative of this case unless the evidence at the hearing should insistently show that the ruling there is distinguishable and is not applicable in that (a) the clause did not become effective as a contract for any of the reasons contended for by plaintiff or (b) is not operable where it is compelled by monopolistic conditions in a port so as to invalidate the pilotage clause * * * or (c) because of any other reasons advanced by plaintiff concerning the nonapplicability of *Sun Oil*."

become employees of the tow.[2] Plaintiff distinguishes *Sun Oil* because of the claimed existence at Savannah of a monopoly in respect to tug and docking-master services which vessels are compelled to accept. It is contended that the exculpatory clause is contrary to public policy. Counsel further argue that a towage rather than a pilotage arrangement was involved here since the *Devon* was being assisted from her berth by defendant's tugs. Another contention is that there was no express acceptance of the exculpatory clause embodied in the defendant's "Conditions and Rates for Tug Services."

When vessels arrive at the seabuoy off Tybee they are met by a pilot boat and a licensed pilot. His services in bringing in the ship are mandatory under Georgia Law. See Ga.Code § 80–110. Atlantic Towing Company does not furnish bar pilotage service. Its business is confined to providing tug and docking-master services for the berthing and unberthing of vessels and towage. After a ship enters the harbor and approaches her berth the bar pilot terminates his services by saying in effect to the master, "Here's your ship and there's your berth." Generally, the agent of the vessel notifies the Atlantic Towing Company a day or two in advance of her arrival. When the ship reaches the city two tugs are dispatched to her by defendant. The docking-master goes aboard, proceeds to the bridge and introduces himself to the master. He tenders his services in docking the ship and in doing so hands the captain the "rate sheet." This is a four-page document signed on behalf of Atlantic Towing Company and by the docking-master. The brochure provides: "It is expressly understood and agreed that the following terms and conditions shall be applicable upon the furnishing and acceptance of any service by Atlantic Towing Company, its tugs or their officers and crews or any tugs employed by said Company and the officers and crews of same." Conditions and rates are set forth as to docking or undocking, overtime, tows, etc. and it also contains the exculpatory provision referred to above.

The ship's master is furnished a "blue ticket" and a "pink ticket" which he signs. The former sets forth the particular service to the ship and the time involved "as per conditions and rates for tug services, a copy of which has been received by me." The "pink ticket" is a bill, usually for $10.00, submitted by the docking-master to the master as his fee for directing the described ship movement.[3] The master is also handed an envelope containing a $10.00 gratuity from the Atlantic Towing Company for which he signs a receipt.

Such was the procedure followed on the early morning of August 2, 1966 when the *Devon* arrived at Savannah. Docking-master Strickland, a salaried employee of defendant, went aboard her

2. Other cases in the *Syracuse* line of descent relied on as to the invalidity of liability-exempting provisions in towage cases are: The Somers N. Smith; The Crescent, D.C., 120 F. 569; The Edmund L. Levy, 2 Cir., 128 F. 683; Alaska Commercial Co. v. Williams, 9 Cir., 128 F. 362; The Sea Lion, D.C., 12 F.2d 124; British Columbia Mills Tug & Barge Company v. Mylroie, 259 U.S. 1, 42 S.Ct. 430, 66 L.Ed. 807; Compagnia de Navegacion, Interior, S. A. v. Fireman's Fund Insurance Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787; Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78.

3. On it appears the following condition: "PILOT NOT TO BE HELD PERSONALLY LIABLE—The services of the pilot while on board the vessel are accepted on the understanding that the owner of a vessel which is making use of her own propelling power, will not assert any personal liability to respond in damages, including any rights over, against the pilot for any damage sustained or caused by the vessel, even though resulting from the pilot's negligence, in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting services and in respect to the handling of such vessel; excepting, however, the personal liability or rights over against the pilot for his wilful misconduct or gross negligence."

to tender and to render docking services. She was berthed under his supervision. When the *Devon* left the following day the same routine was followed. Docking-Master Missroon presented himself aboard her to handle the unberthing. He coordinated the maneuvers of the two tugs, attached to the vessel, by means of a two-way radio that he carried with him.[4] During the undocking all orders connected with the handling of the ship were telegraphed by Docking-Master Missroon to the engine room. He was in sole charge aboard the *Devon* of the unberthing operation.

This is a convenient point at which to recur to *Sun Oil* and to *The Steamer Syracuse* in order to examine each of the two lines of authority in the light of the facts here. The former seems to be indistinguishable. The exculpatory clause was practically identical with the Savannah one. The factual situation in *Sun Oil* differs only in the fact that the vessel was being piloted through the harbor at New York by the tug captain enroute to the dock at the time she went aground. She was accompanied by a tug. The ruling in *Sun Oil* has not been eroded by subsequent decisions. It has been recognized or reaffirmed in Tankers and Tramps Corp. v. Tug Jane McAllister, et al., 2 Cir., 358 F.2d 896; Transpacific Carriers Corp. v. Tug Ellen F. McAllister, 2 Cir., 336 F.2d 371; Trinidad Corporation v. S.S. Sister Katingo, D.C., 280 F.Supp. 976.[5] In the latter case the District Court said: "We reject completely Nautilus' contention that this Pilotage Clause is invalid. The clause has been uniformly upheld against attack." In

*Transpacific Carriers, supra,* the Court of Appeals for the Second Circuit, relying on *Sun Oil* and rejecting *Bisso*, concluded, "Having accepted towing services under an agreement providing for certain limitations of liability, libelant is not entitled to have this court rewrite the contract and impose liabilities not bargained for."

*The Steamer Syracuse* and *Bisso v. Inland Waterways Corporation* as well as the other cases of that genre cited by counsel involved towage of a vessel or barge without power of its own, a "dead" vessel, so to speak. In *Sun Oil* the Supreme Court distinguished the case of *The Syracuse* and in *Bisso* it differentiated *Sun Oil* on that ground. In the latter case it was said (349 U.S. 94, 75 S.Ct. 634):

"It is one thing to permit a company to exempt itself from liability for the negligence of a licensed pilot navigating another company's vessel on that vessel's own power. That was the *Sun Oil* case. It is quite a different thing, however, to permit a towing company to exempt itself by contract from all liability for its own employees' negligent towage of a vessel. Thus, holding the pilotage contract valid in the *Sun Oil* case in no way conflicts with the rule against permitting towers by contract wholly to escape liability for their own negligent towing." [6]

■ Counsel for plaintiff argue that this was a towage and not just a pilotage situation since tugs were assisting the *Devon*. Defendant's tug and docking-master services, they contend, are in-

---

4. The job of the tugs is to steer the ship and to point her in the direction she is to proceed. This is accomplished by them in co-ordination with the vessel's own power.

5. I use the third-party proceeding title of the case. To the decisions cited above might be added California v. the S. S. Jules Fribourg, D.C., 140 F.Supp. 333, 340. There the District Court got around *Sun Oil* by a strict construction of the release-from-liability clause so as to make it inapplicable.

6. I do not mean to infer that in *Bisso v. Inland Waterways Corp.* factual distinctions damaging to Atlantic Towing Company are not made by the Court. For one thing it pointed out (p. 92f, 75 S.Ct. 629) the great extent to which pilotage and pilots are regulated by state and federal law. This apparently refers to bar pilots. There is no such strict regulation of tug masters although the latter are licensed.

separably connected. One is never furnished without the other. But this interrelation of towage and pilotage does not make the exoneration clause any less effective in the case of fault by the docking-master. Had the *Devon* run aground as the result of negligence by an assisting tug, I might be hard put to get around the line of authority illustrated by *The Steamer Syracuse* and *Bisso*. But that is not the case before me.[7] We have here a ship undocked under her own power, assisted by tugs, under the direction of a docking-master stationed on her bridge. Under these circumstances, Sun Oil v. Dalzell and other cases cited above tell me that the towboat company can validly relieve itself of liability.

Counsel for plaintiff characterize as pure fiction the idea that Missroon was a servant of the ship. They assert that the contrivance under which the ship pays the docking-master a nominal fee for his services cannot make fiction fact.[8] Granting all this, the shipowner is no better off than before. There is nothing to prevent these two parties from agreeing by contract that what is so is not. Further, the loaned-servant theory was but one of the means by which the towing company sought exculpation from liability in rendering docking services. Apart from the fictional device, the pilotage clause in terms immunized the towboat company from the consequences of the actions or orders of the docking-master.

■ Plaintiff claims that the contractual exemption from liability is the product of a monopoly in the harbor by Atlantic Towing Company which is the only concern furnishing such services. Vessels must utilize defendant's tugs and docking-masters on Atlantic's terms and it refuses to dock and undock without the pilotage clause. Plaintiff's argument about a monopoly stems from the statement in *Sun Oil* that "Respondent

had no exclusive privilege or monopoly in respect to the services that petitioner desired to have performed for its tanker. And petitioner was under no compulsion to accept the terms of respondent's pilotage clause. There is nothing to suggest that the parties were not on equal footing or that they did not deal at arm's length."

A similar argument as to monopoly was advanced in Transpacific Carriers Corp. v. Tug Ellen F. McAllister, *supra*. A monopoly by towboat companies was claimed to exist in New York harbor rendering contracts such as this invalid. The point was not made on the District Court level and the appellate court did not resolve the factual question. In Trinidad Corporation v. S.S. Sister Katingo, *supra*, there was a collision in New York harbor during the undocking of a vessel handled by a docking-master of Moran. The District Judge said, "Nautilus has adduced no evidence that the clause is the result of a monopolistic bargaining position. To the contrary, Moran has demonstrated the reasonableness of shifting liability to the vessel." There is little question that in providing the only towboat and docking-master services available at Savannah the Atlantic Towing Company has no competition and is in a superior bargaining position. Apparently, there is not enough towage business to justify another tugboat company risking the heavy investment required. An advantageous bargaining position alone does not create a monopoly. The defendant is not a common carrier. It possesses no exclusive franchise. The pilotage clause was not the fruit of the power to drive a hard bargain but was progenerated by the understandable reluctance of the tug owner to risk responsibility for damage to a costly vessel undocked under her own power on orders transmitted to her engine room by its docking-master.

7. Plaintiff conceded at the hearing that no negligence of the tugs contributed to the grounding of the *Devon*. The sole fault relied on is that of defendant's docking-master.

8. This arrangement is a long-standing custom at Savannah and elsewhere. Apparently, the nominal fee is for the purpose of showing that the pilot is acting on his own and beyond the scope of his duty for his employer.

What I am asked to do here is to set aside an exemption from liability employed by towboat companies in every seaport in this country, including several in which there is, I venture to say, only one supplier of such service. This I cannot do.

The remaining issue is whether a release from liability can be effective by mere delivery of the Conditions and Rates to the ship's master and in the absence of an express agreement between the parties. Captain Weston testified that they were not handed to him when the pilot came aboard and denied that the exclusion was ever brought to his attention. However, I must conclude from the evidence that the conditions were delivered to him though whether he read them I am doubtful. Be that as it may, plaintiff conceded at the trial that Weston had general knowledge of the existence of the exclusion.[9] The evidence showed that on two occasions prior to August 3, 1966 the "rate sheet" had been handed to him. In every instance he signed the "blue ticket" which referred to the conditions and rates and in which he acknowledged the fact that "a copy * * * has been received by me." Furthermore, masters of other vessels of plaintiff's line received a copy of the towage conditions at Savannah on twenty-six separate occasions from 1964 up until August, 1966.

Plaintiff presses the argument that there must be actual knowledge and an express agreement as to the exclusion. Counsel lay much store by the decision in Tankers and Tramps Corporation v. Tug Jane McAllister et al., *supra*. The facts in that case bear resemblance to those here. A majority of the Court held that the evidence failed to show that the New York Harbor Pilotage Clause contained in the towing company's schedule was brought to the attention of the ship's master or shipowner. The dissenting judge thought that the history of the prior dealings established the fact that the parties intended that the exculpatory clause would be incorporated in the oral contract made with the ship's agent for tug services. The case is differentiable from this in several respects, among them, the fact that the rate schedule was never delivered to the master as I have found was done here.

■ There is no necessity for express assent to the pilotage clause by the shipowner. Plaintiff and defendant here contracted with reference to conditions of tug service in which the exclusion was embodied. That is enough. Here, as in Trinidad Corporation v. S.S. Sister Katingo, *supra*, the evidence

> "convincingly demonstrates that Nautilus had full awareness and notice of the Pilotage Clause. Nautilus executives and Captain Fertig were not newcomers to this port. Over a considerable period of time they had been given copies of the Moran Rate Schedule wherein the aforesaid Clause was set out; had prior dealings with Moran and were fully aware of what the Clause embraced; knew the custom of the tug industry."

Final judgment will be entered in favor of Atlantic Towing Company on its second defense. This opinion is sufficient to obviate formal fact findings. If counsel for plaintiff desires more explicit findings in any area, they may submit proposals for my consideration.

---

9. Compare the *Sun Oil* case where the ship's master denied that he had ever actually read the clause prior to the trial, but "does admit that he had 'heard of it.'" Sun Oil Co. v. Dalzell Towing Co., Inc., D.C., 48 F.2d 598, at 600.